**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, and | **ORDER AND MEMORANDUM DECISION GRANTING TURNOVER MOTION** |
| STATE OF UTAH DIVISION OF SECURITIES, through Attorney General Sean D. Reyes, | |
| Plaintiffs, v. | Case No. 2:18-cv-00892-TC |
| RUST RARE COIN INC., a Utah corporation, GAYLEN DEAN RUST, an individual, DENISE GUNDERSON RUST, an individual, and JOSHUA DANIEL RUST, an individual | Judge Tena Campbell |
| Defendants; | |
| and | |
| ALEESHA RUST FRANKLIN, an individual, R LEGACY RACING INC., a Utah corporation, R LEGACY ENTERTAINMENT LLC, a Utah limited liability company, and R LEGACY INVESTMENTS LLC, a Utah limited liability company. | |
| Relief Defendants. | |

On March 13, 2019, Zions Bank filed a motion asking the court to resolve a dispute over the ownership of $1.6 million.  (ECF No. 141.)  Both the Leland S. Jacobson Trust (the "Trust") and Receiver Jonathan Hafen, on behalf of Rust Rare Coin, Inc. ("RRC"), have claimed ownership of the funds.  Zions Bank seeks guidance from the court regarding how to disperse the money.

To resolve this dispute, the court established a summary disposition procedure.  (See ECF No. 165.)  As part of that process, the Receiver filed a Motion for Turnover on July 16, 2019, requesting that Zions Bank deposit the $1.6 million into RRC's account.  (ECF No. 227.)  After discovery was completed, the Trust objected to the motion (ECF No. 310) and the Receiver filed a reply (ECF No. 309).  With the court's permission, the Trust also filed evidentiary objections and a sur-reply (ECF No. 316) and the Receiver filed a response to the objections (ECF No. 317).

Having considered all of the briefs, as well as oral argument from the June 16 hearing, the court now finds that the $1.6 million belong to the Receiver.  Consistent with that conclusion, Zions Bank's Interpleader Motion (ECF No. 141) and the Receiver's Motion for Turnover (ECF No. 227) are both GRANTED.

## STATEMENT OF FACTS

At 12:38 p.m. on November 15, 2018, Leland Jacobson initiated a wire transfer of $1.6 million from the Trust's Zions Bank account to RRC's Zions Bank account.  The wire transfer was completed at 12:44 p.m. on the same date.  (LeBaron Dep. at 74:21-75:24, Ex. A to Reply (ECF No. 309-1).)  As of that moment, the funds were visible in RRC's online banking application and were under RRC's control.  (Id. at 76:3-19.)

That afternoon, RRC made several transfers from its account to the accounts of three other individuals.  At 1:16 p.m., RRC transferred $110,000 to Individual 1's account at Bank of America.  At 1:45 p.m., RRC transferred $100,000 to Individual 2's account at Zions Bank. Finally, at 1:58 p.m., RRC made its largest transfer, sending $700,000 to Individual 3's account at Zions Bank.  (Id. at 29:6-30:18, 34:17-37:11; see also Transfer Documents, Ex. B to Reply (ECF No. 309-2).)

Meanwhile, this court was considering allegations that RRC had been secretly operating a widespread Ponzi scheme. At 2:50 p.m., the court granted the Ex Parte Motion for Statutory Receivership Order, Appointment of Receiver, and Other Equitable Relief. (ECF No. 22.) Pursuant to that order, all of RRC's assets were frozen. The court's order was served on Zions Bank just a few minutes later, and by approximately 4:00 p.m., Zions Bank had imposed restrictions on RRC's account that prevented any funds from being transferred in or out. (Waite Dep. at 9:1-10:21, Ex. C to Reply (ECF No. 309-3).)

Later that night, at about 3:00 a.m. on November 16, Zions Bank's internal accounting system attempted to reconcile that day's transactions. The system tried to record that $1.6 million had been deposited into RRC's account, but was unable to do so because of the freeze that Zions Bank had imposed. Instead, the $1.6 million was automatically redirected to a Zions Bank "suspense account." (LeBaron Dep. at 9:20-10:23, 16:7-21:4, 50:4-51:1.) But the transfers to Individuals 1, 2, and 3 (totaling a debit of $910,000) were still reflected on RRC's account statement. In other words, the $1.6 million was now in a suspense account rather than the RRC account and the RRC account showed a $910,000 loss, which resulted in a negative balance. (Id. at 42:3-46:10, 49:10-51:1.)

At about 9:00 a.m. on the morning of November 16, Mr. Jacobson contacted Zions Bank about the wire transfer from the previous day. He explained that he had just learned about the alleged Ponzi scheme operated by RRC, and asked for the return of his $1.6 million. An employee with Zions Bank then classified the transaction as wire fraud and transferred $1.6 million from the suspense account back to the Trust's account. (Id. at 60:24-64:18; Waite Dep. at 5:12-7:15; Glaser Email at 132, Ex. E to Obj. (ECF No. 310-5).)

Over the following days, Zions Bank was able recover the entire $700,000 that had been transferred to Individual 3.  Additionally, of the $100,000 transferred to Individual 2, Zions Bank was able to recover $72,582.53.  No portion of the $110,000 sent to Individual 1 was ever recovered.  (LeBaron Dep. at 38:14-40:2.)

The Receiver was appointed by the court on November 27, 2018.  (ECF No. 54.) Consistent with his obligations under the appointment order, the Receiver has diligently sought to take control of all RRC assets.  The Receiver now seeks to recover the $1.6 million being held in the Trust's account.

## ANALYSIS

According to the Receiver, the $1.6 million wire transfer had been legally accepted by Zions Bank as of 12:44 p.m. on November 15, 2018.  At that moment, the funds became the property of RRC, and as with all other assets of RRC, the Receiver is now the rightful owner of the money.

Mr. Jacobson, on behalf of the Trust, raises two primary arguments in opposition.  First, Mr. Jacobson asserts that Zions Bank cancelled the wire transfer on November 16.  If true, the Receiver would no longer have any interest in the funds.  Second, Mr. Jacobson maintains that even if there was no cancellation, the Receiver is only entitled to the amount in RRC's bank account as of 2:50 p.m. on November 15, when the freeze order was issued.  This would mean that the Receiver could only recover $690,000 from the Trust, not $1.6 million.

In addition to these two contentions, Mr. Jacobson also argues more generally that it would be inequitable to order him to return the $1.6 million to the Receiver.

\\

\\

## I. Acceptance

At the hearing, Mr. Jacobson's counsel conceded that Zions Bank accepted the $1.6 million wire transfer on the afternoon of November 15, 2018.  The court nevertheless briefly addresses the issue of acceptance because understanding how acceptance works affects the discussion below regarding whether the transfer was ever cancelled.

Article 4a of the Uniform Commercial Code, which has been fully adopted by Utah, governs the acceptance and cancellation of wire transfers.  Under Utah Code § 70A-4a-209(2)(a)(i), acceptance of a wire transfer occurs "when the bank pays the beneficiary as stated in Subsection 70A-4a-405(1) or (2)."  And under subsection 405(1), acceptance occurs when:

> (a) the beneficiary is notified of the right to withdraw the credit;
>
> (b) the bank lawfully applies the credit to a debt of the beneficiary; or
>
> (c) funds with respect to the order are otherwise made available to the beneficiary by the bank.

Utah Code Ann. § 70A-4a-405(1) (West 2020).

As of 12:44 p.m. on November 15, 2018, these provisions were satisfied.  At that moment, the $1.6 million transfer was available to RRC through its online banking application.  (LeBaron Dep. at 76:3-19.)  And over the following hour, RRC transferred $910,000 of the $1.6 million to Individuals 1, 2, and 3, which shows that the funds had been "made available" to RRC.  (Id. at 29:6-30:18, 34:17-37:11.)

Zions Bank's automatic accounting system removed the $1.6 million from RRC's account a few hours later, but under the statute, this removal could not undo the earlier acceptance.  Accordingly, the court concludes that acceptance of the wire transfer occurred at 12:44 p.m. on November 15, 2018.

\\

## II. Cancellation

If a wire transfer is cancelled, the bank's earlier "acceptance [of the funds] is nullified and no person has any right or obligation based on the acceptance." Utah Code Ann. § 70A-4a-211(5) (West 2020). Accordingly, if Zions Bank lawfully cancelled the wire transfer, it would be as though the funds had never been received by RRC, and the Receiver would have no right to the funds.

When a wire transfer has not yet been accepted, all that is required for cancellation is for the originator of the transfer to request that the transfer be stopped. Id. at § 70A-4a-211(2). But once a transfer has been accepted, two elements must be met for the transaction to be cancelled. First, the bank must agree to the cancellation. Second, the transfer must have been either unauthorized or a mistake. Id. at § 70A-4a-211(3).

### A. Agreement of the Bank

A wire transfer may be cancelled only if the bank agrees to the cancellation. Mr. Jacobson's strongest evidence that Zions Bank agreed to cancel the transaction is that Zions Bank returned the $1.6 million to the Trust's account on November 16, 2018. Mr. Jacobson argues that Zions Bank would not have moved those funds if it was not at least implicitly agreeing to cancel the wire transfer.

But a closer look at the evidence leads the court to conclude that there was no agreement here. First, Zions Bank denies that it cancelled the transfer. Mr. Jacobson's request for admissions asked Zions Bank to "[a]dmit that Objector canceled the transfer of funds to the Defendants' account(s) before 9:30 a.m., on November 16, 2018." Zions Bank responded:

> Subject to and without waiving the foregoing objections, Zions denies. By way of additional explanation, cancellation is determined by the applicable provisions of UUCC Article 4A. Because the Wire was received by Zions at 12:44 pm on

November 15, 2018, the attempted cancellation requested on November 16, 2018 at 10:35 am was ineffective.

(Request for Admissions No. 13, Ex. E to Reply (ECF No. 309-5).)

This point was reiterated in an affidavit from Karl LeBaron, a representative of Zions Bank, who declared that "[a]t no time did Zions Bank cancel or agree to cancel the Jacobsen [sic] Wire Transfer." (LeBaron Decl. ¶ 3, Ex. D to Reply (ECF No. 309-4).)[1]

Deposition testimony and emails from Zions Bank employees further bolsters the Receiver's claim that there was no agreement to cancel the transfer. Most notably, wire fraud specialist Kaylynn Glaser was the employee who actually moved the $1.6 million from the suspense account back to Mr. Jacobson's account. In an email justifying that transfer, she wrote:

> Rust Rare Coins accounts are held with Zions Bank. I went into their account and realized the wire was never posted. We found out that the wire was sitting in posting rejects as Legal had a freeze placed on Rust Rare Coins account yesterday 11/15/18. I reached out to posting rejects and asked them to credit the funds into our wires GL instead of Rust Rare Coins account. We should be able to credit the funds back to The Leland S. Jacobson Trust in the morning at which point we will notify the bankers involved.

(Glaser Email at 132.)

There is also persuasive testimony from Brent Waite, Zions Bank's in-house counsel and the person who implemented the freeze on the RRC account, that there was no agreement to cancel the transfer. He had a conversation with Mr. Jacobson on November 16 about whether the $1.6 million could be returned to the Trust's account. Mr. Waite testified that in that conversation, he told Mr. Jacobson:

---

[1] Mr. Jacobson objects to both the declaration and the discovery responses on the ground that these statements are improper legal conclusions. (Evid. Obj. (ECF No. 316).) The court disagrees and overrules the objections. Mr. LeBaron and Zions Bank were speaking to a factual question regarding whether Zions Bank agreed to cancel the transfer. A declaration from a bank representative does not automatically or definitively resolve whether the bank agreed to a cancellation. Rather, evidence of Zions Bank's subjective view of the transaction is simply one relevant consideration, together with Zions Bank's conduct and any other circumstantial evidence available to the court.

> [M]y understanding was that the freeze had been put in place. And then it was
> able to prevent the wire from coming into the account. At least that was my
> understanding at the time. And so what I told him was that I thought he was—
> that the funds had not made it into the account. That he was probably—if
> everything held on, as I was relating, that he was probably the luckiest person in
> the world. And that he had a new best friend in our employee who had
> implemented the freeze. Because my understanding was the freeze had been
> implemented before the wire hit.

(Waite Dep. at 7:3-15.)

The most reasonable interpretation of this evidence is that at least two Zions Bank

employees believed that the $1.6 million transfer never made it into the RRC account. In other

words, it appears that they believed the funds could be returned to the Trust's account because

Zions Bank had never legally accepted the transfer.

Mr. Jacobson suggests that Mr. Waite was not the individual who actually returned the

funds to the Trust, so his misunderstanding about the status of the transfer is irrelevant. Mr.

Jacobson also cites deposition testimony from Mr. LeBaron, who, in discussing Ms. Glaser's

email, explained that her statement that the wire "never posted" was referring only to Zions

Bank's internal accounting procedures, not to whether the wire was never posted to the RRC

account. (LeBaron Dep. at 62:1-64:11.)

The court is not persuaded by either of these arguments. Perhaps Mr. Waite's testimony

should receive less weight, given the ancillary role he played in returning the funds to the Trust,

but it is still relevant that Zions Bank's legal counsel evidently did not believe that the funds had

ever reached RRC. And the most reasonable reading of Ms. Glaser's email is that her reference

to "their account" is a reference to RRC's account, and that she did not believe that Zions Bank

had ever placed the funds in RRC's account. Both Zions Bank employees essentially expressed

a belief that the wire transfer had never been completed. If the wire transfer was not completed,

then it could not have been accepted by Zions Bank. And if it was never legally accepted by

Zions Bank, then the only element necessary to return the funds to Mr. Jacobson would be that he requested his money back.  Utah Code Ann. § 70A-4a-211(2) (West 2020).  The bank's consent would be irrelevant.

It appears that this is the reason the funds were returned.  Mr. Waite and Ms. Glaser did not "agree" to cancel the transfer in any meaningful sense.  Rather, they believed that because the funds had never been accepted by Zions Bank in the first place, and because Mr. Jacobson had requested the return of the funds, cancellation was required regardless of whether the bank agreed with that course of action.  When combined with the Zions Bank discovery responses and Mr. LeBaron's declaration, the court is persuaded that Zions Bank never agreed to cancel Mr. Jacobson's wire transfer.

### B. Mistake by the Transferor

In any event, even assuming Zions Bank had agreed to cancel the transfer, the court would still conclude that the cancellation was ineffective because Mr. Jacobson has failed to show that the transfer was based on a mistake.[2]

After a wire transfer has been accepted, it may only be cancelled upon a showing that the initial transfer was unauthorized or mistaken.  More specifically, Utah law states:

> (b) With respect to a payment order accepted by the beneficiary's bank, cancellation or amendment is not effective unless the order was issued in execution of an unauthorized payment order, or because of a mistake by a sender in the funds transfer which resulted in the issuance of a payment order:
>
> (i) that is a duplicate of a payment order previously issued by the sender;

---

[2] Mr. Jacobson suggests in his sur-reply that "[i]t is unclear" whether a court must address both the agreement and the mistake elements, or whether the agreement element alone is sufficient to prove that a cancellation has occurred. (Sur-Reply at 15 n. 6 (ECF No. 316).)  The only authority cited for that proposition is Fischer & Mandell LLP v. Citibank, N.A., Case No. 09 CIV. 6916 RJS, 2010 WL 2484205 (S.D.N.Y. May 27, 2010).  But in that action, the court found that there had been no agreement by the bank, so reaching the second element was unnecessary. Where there has been an agreement, it is clear that the element of mistake must also be satisfied.  See U.C.C. § 4A-211, cmt. 4 (Unif. Law Comm'n 1989) ("cancellation or amendment is possible only" if the requirements of Subsection (c)(2)—which has been enacted in Utah as subsection (3)(b)—are met) (emphasis added).  The court addresses this element only for the sake of completeness.

> (ii) that orders payment to a beneficiary not entitled to receive payment from the originator; or
>
> (iii) that orders payment in an amount greater than the amount the beneficiary was entitled to receive from the originator.

Utah Code Ann. § 70A-4a-211(3)(b).

Mr. Jacobson does not argue that the transfer was unauthorized.  Instead, he contends that because RRC was defrauding its investors (including Mr. Jacobson), it was a "mistake" to transfer funds to RRC.

There is no authority supporting this interpretation of mistake.  This situation is simply not covered by the three types of mistakes identified in Subsections (i) through (iii) of the statute. Subsections (i) and (iii) involve mistakes regarding the <u>amount</u> of the transfer (<u>e.g.</u> the correct amount was accidentally sent twice or more money was sent than the transferor intended). Subsection (ii) involves a mistake regarding the <u>identity</u> of the transferee.  Mr. Jacobson did not make a mistake regarding either the amount of the transfer or the identity of the transferee.

Mr. Jacobson urges the court to embrace a broader interpretation of Subsection (ii), arguing that the words "not entitled to receive payment" imply more than just mistaken identity. The court disagrees.  The official comments to the U.C.C. clearly explain that "not entitled," in this context, refers to a mistaken identity.  The comments use the following example to illustrate what "not entitled" means here:

> Case #3.  Originator owed $1,000,000 to X.  Intending to pay X, Originator ordered Bank A to pay $1,000,000 to Y's account in Bank B.  Bank A issued a complying payment order to Bank B which Bank B accepted by releasing the $1,000,000 to Y.  Under subsection (c)(2)(ii) [enacted as (3)(b)(ii) in Utah], Bank A can cancel its payment order to Bank B with the consent of Bank B if Y was not entitled to receive payment from Originator.

U.C.C. § 4A-211, cmt. 4 (Unif. Law Comm'n 1989).

Mr. Jacobson has never suggested that he intended to send the funds to someone other than RRC. Accordingly, the court concludes that this provision does not apply.

Although Mr. Jacobson cites numerous cases discussing the evils of Ponzi schemes generally, he has identified no case interpreting Subsection (ii) in the more expansive manner that he proposes. See Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372 (S.D.N.Y. 2010); In re Manhattan Inv. Fund Ltd., 397 B.R. 1 (S.D.N.Y. 2007); S.E.C. v. Infinity Grp. Co., 993 F. Supp. 324, 331 (E.D. Pa. 1998); Schwartzman v. Sierra Capital Res., LLC, Case No. CIV. A. 10-03130, 2012 WL 5354595 (E.D. Pa. Oct. 31, 2012). Nor do any of these cases persuade the court to adopt an interpretation of Subsection (ii) that goes against the clear meaning of the text.

Like many others, Mr. Jacobson was a victim of RRC's fraudulent misrepresentations. But Mr. Jacobson cites no authority interpreting "mistake," as that term is used in § 70A-4a-311(3)(b), to mean a decision made because of another's fraud. Simply put, Mr. Jacobson did not make a mistake here. He intentionally and knowingly chose to transfer $1.6 million into the account of RRC. The amount was correct and the recipient was correct. Accordingly, Zions Bank had no discretion to cancel the transfer and return the funds to Mr. Jacobson.

### III. Amount Owed to the Receiver

Mr. Jacobson next argues that even if there was no cancellation, the Receiver is not entitled to the full $1.6 million initially wired to the account. While RRC initially received $1.6 million, it then transferred $910,000 from its account to three other accounts. By the time the court's order took effect on the afternoon of November 15, only $690,000 of the original $1.6 million remained in the RRC account. Mr. Jacobson contends that since the Receiver is only entitled to assets owned by RRC as of the moment the assets were frozen, the Receiver should

collect only $690,000 from Mr. Jacobson (with the remaining $910,000 staying in the Trust's possession).

There is no legal basis for the Trust to retain $910,000 that does not belong to it. For the reasons stated above, the entire $1.6 million became the property of RRC as soon as it was transferred to RRC's account. Lacking any legal interest in the funds, the Trust must return the full amount to the Receiver.

Mr. Jacobson is correct that, had the seizure of assets gone according to plan, the Receiver would have only initially received $690,000, based on what was available in the RRC account at the time of the court's order. But the Receiver then would have proceeded against Individuals 1, 2, and 3 to attempt to recover as much of the remaining $910,000 as possible. The Receiver's goal would have been to recover the entire $1.6 million, though he may not have actually been successful in doing so.

Of course, things did not go according to plan. Because Zions Bank's accounting system moved the entire $1.6 million out of the RRC account in the early morning of November 16, there was no $690,000 waiting in the account for the Receiver. Instead, the account had a $910,000 debt. Zion's Bank ultimately recovered $772,582.53 from Individuals 2 and 3 to pay off most of that debt. But even after the Trust returns the full $1.6 million to the Receiver, approximately $138,000 of that amount will still need to be used to cover the deficit left by the $910,000 transfers. In short, providing the full $1.6 million to the Receiver will not result in a windfall to the Receiver, as Mr. Jacobson suggests.

Accordingly, the court concludes that Mr. Jacobson has not demonstrated any legal basis for letting the Trust retain $910,000 of the $1.6 million investment. The entire amount must be returned to the Receiver.

### IV.  Perpetuation of the Fraud

Finally, though not necessarily a legal argument, the court briefly addresses Mr. Jacobson's repeated warnings that it would be inequitable to order the return of the $1.6 million. Mr. Jacobson analogizes his position to that of Jeff and Patricia Watson.  The Watsons tried to invest in the RRC silver pool _after_ the Receiver had been appointed.  The Receiver received permission from the court to return the investment in its entirety to the Watsons, because in the Receiver's view, retaining the funds at that point would simply perpetuate the fraud.

The difference, of course, is that Mr. Jacobson made his investment _before_ the Receiver was appointed.  Mr. Jacobson complains that this distinction is arbitrary, and that taking his money perpetuates the fraud in the same way that keeping the Watsons' money would have perpetuated the fraud.  But a line must be drawn somewhere, and Mr. Jacobson has not articulated any alternative to drawing that line at the moment the court froze RRC's assets.  The court cannot treat investors differently simply because they invested two years or two months or two hours before the court's order went into effect.  But it is reasonable to treat investors differently if they tried to invest after the court's order was issued.

Accordingly, the court concludes that ordering Mr. Jacobson to return $1.6 million to the Receiver does not perpetuate the fraud.  Rather, such an order is a necessary step in the process of equitably winding down RRC's fraudulent scheme.

### CONCLUSION

Mr. Jacobson's $1.6 million wire transfer was accepted by Zions Bank at 12:44 p.m. on November 15, 2018.  That transfer was never lawfully cancelled at any later point in time. Accordingly, consistent with the court's order freezing RRC's assets, the entire amount must be returned to the Receiver.

Zions Bank's Interpleader Motion (ECF No. 141) and the Receiver's Motion for Turnover (ECF No. 227) are GRANTED.  The court orders Zions Bank to transfer $1.6 million from the Trust account to the RRC account.

Mr. Jacobson may file a claim with the Receiver for the return of his investment, and will be entitled to recover a portion of that investment on the same terms and through the same procedure as all other RRC investors.

SO ORDERED this 25th day of June, 2020.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge