UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, and<br><br>STATE OF UTAH DIVISION OF SECURITIES, through Attorney General Sean D. Reyes,<br><br>    Plaintiffs,<br><br>    v.<br><br>RUST RARE COIN, INC., a Utah corporation, GAYLEN DEAN RUST, an individual, DENISE GUNDERSON RUST, an individual, and JOSHUA DANIEL RUST, an individual,<br><br>    Defendants;<br><br>and<br><br>ALEESHA RUST FRANKLIN, an individual, R LEGACY RACING INC., a Utah corporation, R LEGACY ENTERTAINMENT LLC, a Utah limited liability company, and R LEGACY INVESTSMENTS LLC, a Utah limited liability company,<br><br>    Relief Defendants. | **ORDER AND MEMORANDUM DECISION OVERRULING OBJECTIONS AND GRANTING RECEIVER'S MOTION TO APPROVE DISTRIBUTION PLAN**<br><br><br>Case No. 2:18-cv-00892<br><br>Judge Tena Campbell |

In November 2018, the Commodity Futures Trading Commission (CFTC) and the State of Utah brought this action against Defendants Rust Rare Coin, Inc., Gaylen Dean Rust, Denise Gunderson Rust, and Joshua Daniel Rust (collectively, "Rust Rare Coin"), accusing them of operating a major Ponzi scheme. (ECF No. 1.) Through a series of preliminary injunctions, the

1

court froze all of the assets of Rust Rare Coin. (See ECF Nos. 22, 53, 54, 59, 69, 77.) The court also appointed Jonathan Hafen as Receiver for the Rust Rare Coin estate and instructed him to liquidate its assets. (ECF No. 54.)

The Receiver has now filed a motion to approve his proposed distribution plan to compensate the victims of the Rust Rare Coin fraud. (ECF No. 298.) The court has received fourteen objections to this proposal. (ECF No. 325). Having reviewed each objection and having considered the arguments made by the objectors at three separate hearings held on August 17 and 18, the court now overrules the objections and grants the Receiver's motion.

**I.      Legal Standard**

"In general, this Court has broad authority to craft remedies for violations of the federal securities laws. . . .  The Court has the authority to approve any [distribution] plan provided it is fair and reasonable." S.E.C. v. Byers, 637 F. Supp. 2d 166, 174 (S.D.N.Y. 2009) (internal quotation omitted) (collecting cases); S.E.C. v. Vescor Capital Corp., 599 F.3d 1189, 1194 (10th Cir. 2010) ("It is generally recognized that the district court has broad powers and wide discretion to determine . . . relief in an equity receivership.") (internal quotations omitted).

In crafting a distribution plan, courts frequently favor a pro rata distribution of funds and disfavor attempts to trace losses to individual investors. See S.E.C. v. Quan, 870 F.3d 754, 762 (8th Cir. 2017) ("Courts have 'routinely endorsed' the pro rata distribution of assets to investors as the most fair and equitable approach in fraud cases.") (collecting cases); S.E.C. v. Credit Bancorp, Ltd., 290 F.3d 80, 88 (2d Cir. 2002) ("[T]he use of a pro rata distribution has been deemed especially appropriate for fraud victims of a Ponzi scheme."). The type of pro rata distribution method that is "most commonly used (and judicially approved) for apportioning

receivership assets" is known as the "rising tide" method. S.E.C. v. Huber, 702 F.3d 903, 906 (10th Cir. 2012).

## II. Proposed Distribution Plan

The Receiver's plan is made up of two key components: the use of a class system to categorize and rank the types of claims received and a distribution method based on the rising tide principles.

### A. Classes

First, the Receiver proposes dividing the potential claims into six distinct classes, with claims in lower classes receiving no distributions until the claims in higher classes have been fully satisfied.[1] The six classes are:

1. Administrative costs of the Receiver and the Rust Rare Coin estate;
2. Tax liabilities;
3. Secured creditors (to be paid out of the proceeds of their collateral);
4. Unsecured creditors and defrauded investors;
5. Non-recognized trade creditor claims; and
6. Insider or subordinated claims.

As a practical matter, the Receiver believes the first, second, and third classes will be paid in full, the fourth class will be paid in part, and the fifth and sixth classes will receive no payments.

---

[1] Under this court's earlier orders, all claims were to be filed with the Receiver by October 4, 2019. (ECF No. 239.) The Receiver represents that it has received 605 claims seeking a total of approximately $168 million. At present, the Receivership estate has only approximately $10 million to distribute. The Receiver is still evaluating these claims to determine which should be allowed and which should be denied. Once the Receiver completes this work, claimants will have an opportunity to object to the Receiver's conclusions regarding the validity of each claim. This order addresses only the distribution procedures in general, not the validity of any particular claim that will ultimately be paid out using these procedures.

## B. Rising Tide Distribution

Second, the Receiver proposes distributing assets using the rising tide method. This is essentially a pro rata distribution that takes into consideration not only how much a person invested with Rust Rare Coin, but also what percentage of their investment was returned to them before the Receiver was appointed.

The Receiver uses the following hypothetical to explain the calculations:

| Investor | Adjusted Investor Claim | Pre-Receivership Recovery | Percentage Return |
|---|---|---|---|
| A | $100,000 | $0.00 | 0% |
| B | $200,000 | $40,000.00 | 20% |
| C | $100,000 | $80,000.00 | 80% |

> Under this scenario, Investor A would be the first to receive a distribution, as their percentage return is 0%. Investor B will not receive a distribution unless and until Investor A has received a 20% percentage return or, in this illustration, distributions of $20,000.00. In the event Investor A receives $20,000.00 in distributions and there remain additional funds to distribute, Investor B will begin receiving distributions with Investor A proportionate to their Allowed Claims. Based on the above illustration, in the event there is an additional $6,000.00 to distribute, Investor A would receive $2,000.00, and Investor B would receive $4,000.00 (an additional 2% return to each Investor). Investors A and B will continue to receive distributions to the exclusion of Investor C until Investors A and B have both received an 80% percentage return. In the event Investors A and B receive distributions sufficient for both to receive an 80% percentage return and there remain additional funds to distribute, Investor C will begin receiving distributions with Investors A and B proportionate to their Allowed Claims.

(Mot. at 7 (ECF No. 298).) Using this method, the Receiver estimates that about 75% of claimants would receive at least some type of distribution.

//

//

//

4

### III. Objections

#### A. Class-based Objections

1. <u>Class Four Objections</u>

The Receiver's proposed Class Four combines claims from unsecured creditors and defrauded investors. Unsecured creditors include, for example, individuals who sold items to Rust Rare Coin but never received payments; employees of Rust Rare Coin who never received their last paychecks or other benefits; and vendors who provided services to Rust Rare Coin but were never paid. Meanwhile, the defrauded investors category includes all those who invested in the Rust Rare Coin silver pool.

Daxson Hale (who objects on behalf of himself as well as Jared Clark Gay and J. Scott Rakozy) (<u>see</u> ECF No. 325-7) and Sara McCormick (<u>see</u> ECF No. 325-6) are unsecured creditors who argue that their claims should be placed in a class above the defrauded investors. They maintain that investments are inherently risky and that the investors should have known that there was a possibility that they would lose their investments. Employees and vendors, by contrast, simply entered normal, non-risky contracts with what appeared to be a typical business. Because of this difference in risk, the unsecured creditors contend that their claims should take priority over the investors' claims.

Alice Jones (who objects on behalf of herself and Jennifer Jones Clawson, Bryan Douglas Jones, Lindsay Erin Jones, and Courtney Jones Nielsen) (<u>see</u> ECF No. 325-8), Gloria Bowman (who objects on behalf of herself and Phyllis Bowman, David Bowman, Katherine Bowman, Sarah Bowman, Jeannette Dieman, and various affiliated trusts and LLCs) (<u>see</u> ECF No. 325-9), and Kathleen Barlow (<u>see</u> ECF No. 325-10) are all defrauded investors who argue that their

investments should receive priority above the claims of unsecured creditors.[2] In response to the arguments above, these objectors point out that unsecured creditors <u>do</u> assume risks when they engage in business. If they did not want to take on such risks, they should have insisted on receiving some type of security interest to protect themselves, which would have allowed them to become secured creditors. The investors take the position that absent such security, these creditors should not get special treatment.

The investors also assert that it is standard for investor claims to take priority over the claims of unsecured creditors. For support, they cite two cases, <u>C.F.T.C. v. Capitalstreet Fin., LLC</u>, Case No. 3:09-cv-387-RJC-DCK, 2010 WL 2572349 (W.D.N.C. June 18, 2010), and <u>S.E.C. v. HKW Trading, LLC</u>, Case No. 8:050-cv-1076 T-24-TBM, 2009 WL 2499146 (M.D. Fla. Aug. 14, 2009). In both cases, the court approved distribution plans that prioritized defrauded investors above general creditors.

The court is not inclined to change the Receiver's plan based on these cases. Neither case includes any legal analysis or explanation regarding the relationship between investors and creditors. Instead, it appears that in each instance, the receivers in those cases proposed plans that prioritized investors over creditors, for unknown reasons, and the court accepted those plans because no one objected.[3] Neither case explains what a court should do when a receiver proposes treating the two groups the same and both groups object to that proposal.

---

[2] After initially filing three separate objections, these same objectors filed a joint consolidated objection responding to some of the arguments the Receiver made in response to their initial objections. (<u>See</u> ECF No. 325-11.)

[3] At the hearing, the Receiver speculated that the treatment of general creditors in other cases may simply reflect the fact that most of the time, the unsecured creditors, if any, are not entirely innocent. Unlike most Ponzi schemes, this case involved several legitimate enterprises that employed real employees and engaged in real business with customers and vendors. In most Ponzi schemes, by contrast, legitimate contracts are rare and the few employees involved are often complicit in the fraud to one degree or another, which lessens the need to protect their interests in the distribution plan.

Ultimately, the court agrees with the Receiver's view that equity is best served by treating the unsecured creditors and defrauded investors as being part of the same class. On the one hand, it is true that the unsecured creditors were, in some sense, less blameworthy than the defrauded investors. They did not engage in risky behavior like the investors did.[4] On the other hand, the only reason any funds are available to pay the unsecured creditors is because of the unlawful investments Rust Rare Coin obtained. If Rust Rare Coin had simply been a normal enterprise that had gone out of business, the unsecured creditors likely would have had no recovery at all. A recovery is possible here because this was a Ponzi scheme and the Receiver was empowered to claw back distributions made to earlier investors. Accordingly, in some sense, the defrauded investors are subsidizing the recovery of the unsecured creditors.[5]

Additionally, the Receiver notes that if the unsecured creditors were placed in a class below the investors, none of the unsecured creditors would receive any recovery. The Receiver's goal is to ensure that as many victims as possible receive at least some compensation for their losses and this goal is best accomplished by treating unsecured creditors and defrauded investors as part of the same class.

Weighing all of these factors—the relative innocence of the unsecured creditors, the fact that the recovery is built on funds contributed by defrauded investors, and the need to help as

---

[4] To be sure, as Ms. Bowman persuasively argued at the hearing, the investors only took on the normal risks associated with any investment, not the risk of being defrauded. Still, it cannot be denied that precious metal investments are necessarily riskier than, for example, government-backed bonds or federally insured bank accounts.
[5] Mr. Hale persuasively pointed out at the hearing that the Receiver's administrative costs and fees are also in some sense being paid for by the defrauded investors. The difference, of course, is that the unsecured creditors—though not engaging in the same risky behavior as the investors—still took on the normal risks that accompany any contract entered into in a free market system. Simply put, contracts are sometimes broken and damages are sometimes unavailable. That risk-taking is reason enough to treat the unsecured creditors like the investors rather than like the court-appointed Receiver.

many victims as possible—the court agrees with the Receiver that these groups should be treated the same. Accordingly, all of the above objections are overruled.

2. <u>Thomas Judd Williams</u> (ECF No. 325-5)[6]

Mr. Williams believes that a new class should be added to the distribution plan (to take priority above all others, except the administrative costs) for individuals who had a warehouse or bailee relationship with Rust Rare Coin. Mr. Williams alleges that he paid $30,000 to Rust Rare Coin for the purpose of having Rust Rare Coin purchase silver for him and then store it on his behalf. Mr. Williams maintains that this purchase and storage agreement was never meant to be part of the silver pool scheme operated by Rust Rare Coin.

The court has already ordered the Receiver to distribute all goods that were being held by Rust Rare Coin on a consignment, appraisal, warehousing, or similar basis at the time of the Receiver's appointment. (<u>See</u> ECF Nos. 294, 306.) The Receiver represents that he has no record of any silver being purchased or stored on Mr. Williams's behalf. "It appears that [Rust Rare Coin] merely accepted Mr. Williams' payment and either never ordered his goods or ordered his goods and subsequently liquidated them to make payments to other investors." (Reply at 10 (ECF No. 327).) Because there are no goods to return to Mr. Williams, the Receiver recommends that Mr. Williams's claim be treated the same as other victims of Rust Rare Coin's fraud, even if Mr. Williams did not intend to participate in the silver pool.

Even assuming Rust Rare Coin at some point purchased silver for Mr. Williams, the court would nevertheless conclude that he is not entitled to a higher priority than other victims.[7] Mr.

---

[6] Mr. Williams's objection was filed by his attorney, Frank Reed Bennett. He is the only objector represented by counsel, although Peter Guyon, whose objection is addressed below, is also an attorney and is representing himself.
[7] Although it is not clear whether Rust Rare Coin ever actually purchased silver on Mr. Williams's behalf, Mr. Williams's argument is stronger if the court assumes that, at some point, there was actual silver that he could have

Williams's situation is analogous to the facts of <u>Lindsey v. Ipock</u>, 732 F.2d 619 (8th Cir. 1984), which is the end result of one of the cases Mr. Williams cited at the hearing, <u>Missouri v. U.S. Bankruptcy Court</u>, 647 F.2d 768 (8th Cir. 1981).[8] In that case, certain debtors declared bankruptcy and the bankruptcy trustee took control of several grain silos. The trustee sought to sell the grain but several groups moved to stay the sales on the ground that the bankruptcy court lacked jurisdiction over the grain. They argued that the grain had not belonged to the debtors at the time the bankruptcy petition was filed and so was beyond the reach of the trustee.

During an initial appeal, the Eighth Circuit concluded that the bankruptcy did have jurisdiction because of the debtors' <u>possession</u> of the grain but the court was skeptical that the debtors had ever actually <u>owned</u> the grain. <u>Missouri</u>, 647 F.2d at 774. The Eighth Circuit noted that, on the preliminary record available, it appeared more likely that the grain was simply being warehoused for others, who were the rightful owners of the goods. <u>Id.</u> at 778. The Eighth Circuit warned that the trustee could not sell the grain until the bankruptcy court had "particularly examine[d] its authority to order the sale if title documents indicate that the estate possesses no substantial ownership rights to the grain and that any bona fide dispute over the property exists only between third parties." <u>Id.</u>

This is the part of the case that Mr. Williams emphasized at the hearing in order to prove that he is entitled to the return of silver held by Rust Rare Coin. He argues that, similar to <u>Missouri</u>, Rust Rare Coin merely possessed, rather than owned, the silver, and the Receiver

---

claimed. In order to give Mr. Williams the benefit of Rust Rare Coin's unclear records, the court will presume that (at least at some point), Rust Rare Coin did purchase silver for Mr. Williams.

[8] Mr. Williams's attorney, Mr. Bennett, referred to this case at the hearing as "<u>In re Cox Cotton Co.</u>" That was the name of the underlying bankruptcy but not the name of the decision by the Eighth Circuit to which Mr. Bennett was actually citing.

accordingly lacked authority to sell it.⁹  But Mr. Williams ignores what happened after <u>Missouri</u>. Notwithstanding the Eighth Circuit's skepticism, both the bankruptcy court and the district court concluded that the trustee did have the right to sell the grain and authorized him to do so. <u>Lindsey</u>, 732 F.2d at 622.  Rather than appeal that order, certain individuals who claimed an ownership interest in the grain broke into the silos and stole 31,000 bushels of soybeans that they claimed was their property.  <u>Id.</u>  They were held in contempt of court for interfering with the sale and, after appealing that contempt order, argued that the bankruptcy court never should have authorized the sale of the grain due to the lack of true ownership.  But the Eighth Circuit rejected this argument, holding that the individuals could not challenge the sale order in the collateral contempt appeal because they had failed to appeal the original order.¹⁰  <u>Id.</u>

Here, similarly, the court already held a proceeding to determine whether the Receiver could sell all of the silver in its possession.  Mr. Williams did not object as part of that motion and the court authorized the Receiver to liquidate all Rust Rare Coin inventory.  (ECF No. 294.) Accordingly, even assuming there had at some point been silver that Mr. Williams could have claimed, the court has already ordered the sale of such silver.  As in <u>Lindsey</u>, it is now too late for Mr. Williams to argue that he is entitled to the actual goods.

For those reasons, Mr. Williams will be receiving a monetary distribution rather than a distribution of goods, like all other investors and unsecured creditors.  The only remaining question is whether that distribution should take priority over the other claims.  The court

---

⁹ Part of the court's holding in <u>Missouri</u> turned on certain provisions of the Uniform Commercial Code that cover fungible goods like grain.  <u>See</u> <u>Missouri</u>, 647 F.2d at 775 n.13.  The same provisions have been adopted by Utah. <u>See</u> Utah Code § 70A-7a-207.  Although the issue was not briefed, the court will assume for purposes of this analysis that the silver pieces purchased by Mr. Williams were similarly fungible.

¹⁰ The Eighth Circuit also briefly stated that, in any event, it believed the district court's "extensive analysis" regarding the legality of the sale order was correct.  <u>Lindsey</u>, 732 F.2d at 622.

concludes it should not. In making this determination, the court has reviewed <u>Basin Elec. Power Co-op v. ANR Western Coal Dev. Co.</u>, 105 F.3d 417 (8th Cir. 1997), which is the other case cited by Mr. Williams at the hearing. The court has also reviewed Utah Code §§ 70A-7a-207 and 70A-7a-403, which Mr. Williams also asked the court to consider. While these sources discuss an individual's right to certain goods when there is a warehouse relationship, none of them address what to do when the goods no longer exist. Absent any other authority, and mindful of its broad discretion to craft fair and reasonable distributions in Ponzi scheme cases, the court concludes Mr. Williams should be treated the same as unsecured creditors. That is the category that his claim most resembles and for the same reasons that the unsecured creditors are not being placed in a class above the defrauded investors, the court concludes Mr. Williams should be included in Class Four as well.

For the foregoing reasons, Mr. Williams's objection is overruled.

### B. Rising Tide Objections

1. <u>Alan Lambert</u> (ECF No. 325-1)

Although Mr. Lambert initially filed an objection, counsel for the Receiver represented at the hearing that Mr. Lambert had agreed to withdraw that objection. Accordingly, the court does not address this objection.

2. <u>Wayne Hall</u> (ECF No. 325-2)

Mr. Hall objects on the ground that "it makes no sense to me how someone who's net loss was $10,000 could potentially get a distribution, while someone who's net loss was $1,000,000 could potentially get nothing."

The court recognizes that there are large disparities in the amounts that different individuals invested and that this presents a particular problem for creating an equitable

distribution. While there is no simple answer, the court ultimately agrees with the Receiver that the best way to handle the different investment amounts is to focus on the percentage of recovery, rather than the raw numbers. In other words, what matters is not whether someone invested $10,000 or $1,000,000, but what percentage of their investment they have already recovered. Relying on percentages means that, in some cases, Mr. Hall's concern will come true: a person who invested $1 million and has already gotten some of that money back may receive nothing, while a person who invested $10,000 and has not yet gotten any money back will receive a distribution. But the inverse is also true. If someone invested $1 million and has not yet gotten any of it back, that investor will receive a distribution before someone who invested $10,000 and has already gotten half of it back. Although imperfect, the court agrees with the Receiver that this is the best possible option.

Accordingly, Mr. Hall's objection is overruled.

3. <u>Adam Wells</u> (ECF No. 325-3)

Mr. Wells argues that each claim should be evaluated individually, rather than be paid out as part of a formula.

At least to some extent, each claim will be reviewed individually. The Receiver is taking each claim and comparing it to bank and transfer records to determine whether it is legitimate. If the Receiver rejects any claims, the individual claimants will be able to challenge that decision before this court. After receiving this explanation from the Receiver's counsel during the hearing, Mr. Wells agreed that the process was fair and acknowledged that any concerns he had about how his specific investment amount was calculated could be addressed at a later time.

Accordingly, in light of the conversation that occurred at the hearing, Mr. Wells' objection is overruled.

      4. <u>Catherine and Jim Binsacca</u> (ECF No. 325-4)

The Binsaccas' objection details all of the negative consequences they have suffered as a result of their investment in the silver pool. Certainly, these consequences bring home the gravity of Rust Rare Coin's fraud. But the fact that the Binsaccas were innocent victims has no bearing on the merits of the proposed distribution plan. After all, except in those situations where the Receiver may affirmatively allege that an investor acted in bad faith, the court will be treating each investor as an innocent victim. Because of the number of individuals involved in the scheme and the wide variety of different circumstances the investors face, the court cannot instruct the Receiver to engage in an individualized assessment of each investor to determine who has the most sympathetic case. The court must treat the investors the same or else be guilty of arbitrariness.

The Binsaccas also argue that the partial distributions that they were given before the Receiver was appointed should not limit the size of their claim now because that money was used to pay taxes. But the court cannot order the Receiver to exempt the Binsaccas from the requirement that their claim be adjusted based on distributions they have already obtained. There are no articulable lines that can be drawn regarding when to count pre-Receivership disbursements and when to disregard them. Money disbursed by Rust Rare Coin to its investors could have gone toward taxes, interest payments on loans, house payments, car payments, college tuition, other investments, a vacation, or it could have simply been left in a savings account. There is no way for the court or the Receiver to determine which of these disbursements should be ignored and which should be counted when calculating the size of each investor's claim. The court is tasked with creating a "fair and reasonable" distribution plan (see <u>S.E.C. v. Byers</u>, 637 F. Supp. 2d at 174), and an arbitrary rule that counts some pre-Receivership

13

distributions against the amount of a claim, while disregarding other disbursements, would not meet that standard. Counting all disbursements, as the Receiver proposes, is the fairest solution.

For these reasons, the Binsacca objection is also overruled.

### C. Mr. Guyon Objection (ECF No. 325-12)

Finally, Peter Guyon, who is a licensed attorney and claims to have represented Rust Rare Coin and various members of the Rust family for the last forty years, has filed an objection that challenges many different aspects of the lawsuit as a whole. Mr. Guyon argues, for example, that there was no Ponzi scheme or securities fraud; that if there was a Ponzi scheme, he was not part of it; that this court lacks jurisdiction over the matter since any fraud or embezzlement would be state law violations, not federal law violations; that certain questions surrounding the definition of a Ponzi scheme should be certified to the Utah Supreme Court; and that this case (assuming it is properly in federal court) should be before a bankruptcy judge rather than this court.

First, the court has already concluded that it has jurisdiction over this case. (See ECF No. 22.) For the sake of completeness, it repeats those findings here.

> There are two statutory bases for federal subject-matter jurisdiction: diversity jurisdiction under 28 U.S.C. § 1332 and federal-question jurisdiction under 28 U.S.C. § 1331. Federal-question jurisdiction exists for all claims "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "A case arises under federal law if its well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." Morris, 39 F.3d at 1111.

Nicodemus v. Union Pac. Corp., 318 F.3d 1231, 1235 (10th Cir. 2003).

Here, the complaint alleged that Rust Rare Coin violated federal securities laws (see Compl. ¶¶ 8, 21-78, 86-91), which creates federal-question jurisdiction. The court also has

supplemental jurisdiction over the related violations of Utah securities laws (see Compl. ¶¶ 92-108), because those claims are commingled with the alleged federal law violations. See 28 U.S.C. § 1367. Accordingly, to the extent Mr. Guyon's objection challenges the court's jurisdiction over this matter, it is overruled.

Second, the court concludes Mr. Guyon is not the proper person to challenge the existence of the Ponzi scheme as a whole. It is true, as he claims, that this court has so far made only preliminary findings regarding the existence of a Ponzi scheme. That is because, at least for now, the court is not inclined to make any final findings until the related criminal matter is resolved. Once it has been resolved, it will be up to the Plaintiffs (the CFTC and the State of Utah) and the Defendants (Rust Rare Coin, Gaylen Rust, Denise Rust, and Josh Rust) to either stipulate to certain findings or to fully litigate this action through to a final judgment. In other words, the issue of the Ponzi scheme is ultimately between the Plaintiffs and the Defendants, not Mr. Guyon.

On the other hand, Mr. Guyon is certainly entitled to argue that he personally was never part of the Ponzi scheme. But objecting to the Receiver's motion is not the proper forum for doing so.

Mr. Guyon's involvement in the Ponzi scheme may be relevant in one of two ways. First, if he was simply a victim of the Ponzi scheme (either as a defrauded investor or as an unsecured creditor), then he must file a claim with the Receiver in order to obtain a partial recovery through the distribution process. If, as Mr. Guyon appeared to state at the hearing, he does not view himself as a victim of the scheme, then he can simply decline to file a claim and will receive no distribution. In that case, he would have no particular interest in how the distribution procedure works.

Alternatively, Mr. Guyon may actually be a net beneficiary from the Ponzi scheme, meaning he received more in distributions than he invested. If so, the Receiver may file an ancillary action against Mr. Guyon to claw back some of the pre-Receivership distributions that Mr. Guyon received.[11] If the Receiver files such an action, then Mr. Guyon can raise his argument that he was not part of the Ponzi scheme in that case. Either way, his objection is not proper at this time.

Next, Mr. Guyon objects to the court's order appointing the Receiver, arguing that the order deprived him of his right to obtain a recovery from Rust Rare Coin through other means. In particular, Mr. Guyon objects to that part of the court's order that prohibited anyone, including creditors, from filing a bankruptcy petition. (See ECF No. 22 at ¶ 35(a).) Mr. Guyon argues that had this matter gone to bankruptcy, a creditors committee could have been created to oversee the operation of the Rust Rare Coin businesses. That way, Rust Rare Coin could have continued to make a profit even while the investigation was ongoing. Instead, the Receiver elected to liquidate all of the Rust Rare Coin businesses, which Mr. Guyon believes has limited the size of the recovery available to the victims of Rust Rare Coin.

Mr. Guyon misrepresents the breadth of the court's order. The court ordered that no bankruptcy petition be filed "except by leave of the court." (Id. at ¶ 35.) Mr. Guyon or any of the other creditors could have moved to intervene in the suit and filed a motion for permission to move this matter to the bankruptcy court instead. They elected not to do so. Mr. Guyon cannot now complain about the choices the Receiver has made to liquidate the estate when he never

---

[11] The Receiver's counsel represented during the hearing that the Receiver had not yet decided whether to pursue an ancillary action against Mr. Guyon.

16

moved earlier to have the distribution of the estate overseen by a different judge or a different venue.

Finally, Mr. Guyon asks the court to certify three questions to the Utah Supreme Court. Each of these questions involves what presumptions or standards of proof apply to determining whether a Ponzi scheme exists. Again, to the extent these questions are related to proving that there was no Ponzi scheme at all in this case, these issues should be raised by the Plaintiffs or the Defendants, not Mr. Guyon. If, on the other hand, these questions are related to proving that Mr. Guyon personally was not a victim of the Ponzi scheme, then he may raise the issue in an ancillary suit if such a suit is filed against him.[12]

For all of the above reasons, Mr. Guyon's objection is overruled.

At the hearing, Mr. Guyon noted that he had requested certain discovery from the Receiver and that the Receiver and Mr. Guyon had agreed to delay resolving their discovery dispute until after this order was issued. Copies of Mr. Guyon's request for production of documents and request for admissions were attached to his objection. (See Ex. 4 to ECF No. 325-12.) The court makes no findings regarding the appropriateness of these requests. To the extent Mr. Guyon still seeks discovery, he and the Receiver's counsel should meet and confer regarding what, if any, discovery is appropriate in light of this order. In the event of any dispute, discovery motions will be heard by Chief Magistrate Judge Dustin Pead.

//

//

//

---

[12] This is not to say that the court would necessarily agree to certify the questions if they were raised in an ancillary suit, merely that the issue could be fully briefed and reviewed at that time.

## ORDER

All of the objections received in response to the Receiver's motion to approve the proposed distribution plan are OVERRULED.  The motion to approve the distribution plan (ECF No. 298) is GRANTED.

DATED this 20th day of August, 2020.

BY THE COURT

*Tena Campbell*

Judge Tena Campbell
United States District Court
