1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4
    COMMODITY FUTURES TRADING          )
5   COMMISSION, et al.,                )
                                       )
6            Plaintiffs,               )
                                       )
7       vs.                            )
                                       )  Case No:  2:18CV892
8   RUST RARE COIN, et al.,            )
                                       )
9            Defendants.               )
    _____   )
10                                     )

11

12

13

14

15

16              BEFORE THE HONORABLE TENA CAMPBELL

17                      April 12, 2021

18                   ZOOM MOTION HEARING

19

20

21

22

23                      Reported by:
                KELLY BROWN HICKEN, RPR, RMR
24                      801-521-7238

25

```
 1                        APPEARANCES OF COUNSEL

 2    FOR THE RECEIVER:        MANNING CURTIS BRADSHAW & BEDNAR

 3                            BY:  DAVID C. CASTLEBERRY

 4                                Attorney at Law

 5                            136 E SOUTH TEMPLE STE 1300

 6                            SALT LAKE CITY, UTAH  84111

 7

 8    FOR ZIONS BANK:          DORSEY & WHITNEY LLP

 9                            BY:  STEVEN T. WATERMAN

10                                Attorney at Law

11                            111 S MAIN ST 21ST FL

12                            SALT LAKE CITY, UTAH  84111

13    FOR TEMPORARY RECEIVER:  CYNTHIA LOVE
                              Attorney at Law
14
      FOR COMMODITY FUTURES
15    TRADING COMMISSION:        JENNIFER J. CHAPIN
                                Attorney at Law
16

17    FOR UTAH ATTORNEY GENERAL:  PAULA WOODLAND FAERBER
                                Attorney at Law
18

19    FOR JOSHUA DANIEL RUST:     COREY DREW RILEY
                                Attorney at Law
20

21

22

23

24

25
```

```
 1              SALT LAKE CITY, UTAH, MONDAY, APRIL 12, 2021

 2                           *   *   *   *   *

 3              THE COURT:  Okay.  Good morning.  Can you all hear

 4     me?

 5              MR. CASTLEBERRY:  Yes, Your Honor.

 6              THE COURT:  All right.  These are such strange

 7     times.  But we're here in Rust Rare Coin, here today for the

 8     motion of the conflicts receiver to hold Zions Bank in

 9     contempt.  And let's see.  Who is representing the conflicts

10     receiver?  Is that you, Mr. Waterman?

11              MR. WATERMAN:  No, Your Honor.  I represent Zions

12     Bank Corporation.

13              THE COURT:  Mr. Castleberry, are you representing

14     the conflicts receiver?

15              MR. CASTLEBERRY:  I am, Your Honor.  And I have him

16     with me in my office, as well.

17              THE COURT:  Is that you back there, Mr. Klein?

18              MR. KLEIN:  Yes, Your Honor.

19              THE COURT:  Okay.  I've read your papers.  I know

20     what this is about.  But why don't you go ahead.

21              MR. CASTLEBERRY:  Thank you, Your Honor.  This

22     motion for an order to show causes arises out of an order by

23     this court returning $1.6 million to the receiver that is held

24     by Zions Bank.  And the only question before the Court is

25     whether Zions Bank should obey the order and send 1.6 million
```

1    to the receiver.

2           The parties agree on the facts.  The receiver in

3    the Jacobsen trust had a dispute over the ownership of the

4    $1.6 million, and this money was held by Zions Bank.  Zions

5    Bank sought to intervene and interplead the money.  The Court

6    granted that request, and Zions Bank asked that it hold the

7    money during the pendency of the dispute.

8           The receiver of the Jacobsen trust then litigated

9    the dispute.  And while the dispute was still ongoing the hold

10   that Zions Bank had placed on the money expired.  Another

11   interesting fact, an important fact is that at the time of the

12   asset freeze order the money was in an expense account held by

13   Zions Bank, and Zions Bank decided to put that money back in

14   the Jacobsen trust account.

15          They put the money back into the account, had a

16   hold in place, but before the Court decided about the

17   ownership of the money the hold expired.  Jacobsen then went

18   to Zions Bank and withdrew the money.  Eventually the Court

19   decided that the money belonged to the receivership estate.

20   It entered a turnover order.  The receiver asked for Zions

21   Bank to return the money, and Zions Bank found out that the

22   money had been withdrawn and said it cannot comply.  And

23   that's why we're here today.

24          The receiver has moved the Court for order to show

25   cause why Zions Bank should not be held in contempt.  And for

1    Zions Bank to be held in contempt the receiver has the burden

2    of proving three facts: First, that the order is valid;

3    second, that Zions Bank had knowledge of the order; and third,

4    that Zions Bank did not comply or obey the order.

5              The first two elements are not in dispute.  No one

6    disputes that the turnover order is valid.  No one disputes

7    that Zions Bank had knowledge of the order.  The dispute lies

8    in whether Zions Bank disobeyed the order, and the dispute

9    also lies with the fact that once the receiver is able to put

10   forth the three facts, the valid order, knowledge of the order

11   and disobeying the order, the burden then shifts to the party

12   that's being sought to be held in contempt to show one of two

13   things; first, it did comply with the order, or second that it

14   was unable to comply with the order.

15             THE COURT:  Which is what I believe Zions contends;

16   right?

17             MR. CASTLEBERRY:  That is correct, Your Honor.

18   That is correct.  And so first Zions Bank did not comply with

19   the order.  The turnover order at issue is simple.

20   $1.6 million should be sent to the receiver.  That's what the

21   order provided.  Zions Bank has not done so, therefore Zions

22   Bank has disobeyed the order.

23             Zions Bank raises the technicality that the order

24   required it to transfer $1.6 million from the trust account.

25   And since Jacobsen withdrew the $1.6 million from the trust

1    order it cannot comply with the Court's order.  But this

2    argument doesn't pass the straight face test for a couple good

3    reasons.

4           First of all, the turnover order required Zions

5    Bank to transfer the money from the trust account because

6    Zions Bank had represented to the Court that's where the money

7    was located.  And in fact, this is where Zions Bank placed the

8    money.  This $1.6 million as I previously said had been in an

9    expense account, but was returned by Zions Bank to Jacobsen's

10   trust account.  And most critically, Zions Bank did not submit

11   the money to the Court's registry.  It moved to intervene.  It

12   interpleaded the money.  And rather than place the money in

13   the Court's registry, it asked to keep the money.  So

14   therefore, Zions Bank cannot be excused from complying with

15   the turnover order when the money was not in the trust account

16   because Zions Bank caused this issue.

17          Now second of all, Your Honor, Zions Bank could

18   have complied with the Court's order.  Courts in the

19   10th Circuit are clear that parties have to take all

20   reasonable steps in good faith to comply with the Court's

21   order.  And Zions Bank cannot meet this burden.  In fact,

22   Zions Bank has made five material and critical errors that

23   have placed us in the position we are in.

24          First, it asked to hold the money itself.  It did

25   not place the funds with the Court.  If Zions had placed the

 1    money with the Court we would not have to go through this

 2    unhappy exercise right now.  It could have all been avoided.

 3    Second, it did not freeze the money in the expense account as

 4    required by the freeze order.  Third, it returned the money to

 5    the Jacobsen trust account.  Fourth, it placed an internal

 6    hold on this money and then allowed that money to expire.  And

 7    fifth and finally, it did not find out that the money had been

 8    withdrawn for over six months.  If it had found out sooner

 9    immediate steps could be taken to retrieve that money.

10             THE COURT:  What immediate steps could they have

11    taken?

12             MR. CASTLEBERRY:  They could have made a demand

13    that the Jacobsen trust return the money.  It could have

14    frozen the transfer immediately.  Evidently money isn't

15    transferred -- I mean it depends on the time of day.  But we

16    know in this case apparently the money was in an expense

17    account for at least 24 hours.  And if there were internal

18    holds in place the money could have been frozen or stopped or

19    returned or at least demanded to be returned before it had

20    dissipated.  But the important thing, Your Honor, is to know

21    that we shouldn't have even gotten to that point.  There were

22    a cascading number of errors that led to that last point.

23             And it is true that the 10th Circuit hasn't really

24    dealt with a case like this where a bank holds money, it

25    interpleads but asked the money to be -- for the money to stay

1          in its account.  And then when the Court finally orders the

2          money to be sent to one of the parties, the bank says, oh, I'm

3          sorry.  It looks like the money is no longer here.

4                    Courts in other jurisdictions are very clear that

5          if there is noncompliance the noncompliance cannot be

6          self-induced.  We have cited five cases from other circuits

7          that have stated the unremarkable holding that the defense of

8          impossibility cannot be self-created.

9                    For example, some of these cases stay, well, Your

10         Honor, or they say to the Court, we can't return the money at

11         issue because we already spent it.  But it hadn't placed any

12         controls in place to make sure the money was not spent, where

13         other parties have said, well, Your Honor, we would return the

14         money but we've placed it in a foreign trust.  And my hands

15         are now tied.  I don't have access to that trust anymore.

16                   And the courts are not persuaded by those arguments

17         because in those cases the fact that the money is not

18         available or the fact that the money is not there, was a

19         self-created problem.  It was a self-created issue.

20                   And the defense of impossibility is the defense

21         that arises in equity.  Zions Bank has argued the equities.

22         But the equities do not favor Zions Bank.  For the defense of

23         impossibility to apply there needs to be clean hands.  In

24         fact, Zions Bank cannot show that it has clean hands, that it

25         has taken reasonable steps to safeguard this money and it has

1    not acted responsibly or reasonably.

2           And it's important to keep in mind, Your Honor, if

3    any other outcome were ordered banks and high net worth

4    individuals or favored clients could easily collude and allow

5    money that is subject to a court order to be withdrawn by what

6    appears to be a mistake or what appears to be negligence.  The

7    law simply does not allow this type of thing to happen.  If

8    Zions Bank assumes the risk, assumes the responsibility of

9    safeguarding the money, it must safeguard the money.  Its

10   hands must be pristine, and in this case they are not.

11          And for these reasons the receiver respectfully

12   requests that Your Honor order Zions Bank to transfer the

13   $1.6 million at issue to the receiver.

14          THE COURT:  Well, or is that the only remedy you

15   want?  You just want the money transferred?  You don't want

16   any sort of punitive remedies for causing what you say us to

17   go through this unnecessary procedure?

18          MR. CASTLEBERRY:  Yes, Your Honor.  The receiver's

19   also asking for his reasonable fees and costs that have been

20   incurred by going through this unnecessary and unhappy

21   exercise, which is a normal remedy required in an order to

22   show cause.

23          THE COURT:  You haven't submitted any documentation

24   in support of that.  Were I to accept your argument and hold

25   Zions in contempt, what would you anticipate submitting, some

 1     sort of affidavit outlining your fees and costs?

 2               MR. CASTLEBERRY:  Exactly, Your Honor.

 3               THE COURT:  All right.

 4               Mr. Waterman, what do you have to say?

 5               MR. WATERMAN:  Thank you, Your Honor.  The basis

 6     for the receiver's motion for contempt is predicated upon --

 7     and it's a short four-page motion as Your Honor knows, but

 8     it's predicated upon this Court's turnover order from July 25

 9     of 2020.  And in essence they're not just seeking contempt.

10     They are seeking that the Court sanction or fine or make

11     Zions Bank an indemnitor of the $1.6 million.

12               I note that on the exact same day Zions Bank

13     Corporation filed its motion to have Mr. Jacobsen show cause

14     and also sought relief from that turnover order, specifically

15     that the Court amend the turnover to cause Mr. Jacobsen as the

16     possessor of the funds to surrender the funds and to vacate

17     the grant of the interpleader motion because it was granted at

18     a point of impossibility.  And I think we need to backup to

19     some of the facts.  And Mr. Castleberry is correct.  I don't

20     think that any of the key facts are in dispute here.

21               But Zions Bank took the initiative to freeze the

22     1.6 million.  The receiver was busy doing other matters and

23     was not focused on this issue.  It was Zions Bank that

24     determined that there were conflicting claims to the funds.

25     Zions Bank attempted to resolve those conflicts informally and

1    was unable to do so.  Yet it was holding the funds without any

2    order with respect to those funds.  And --

3              THE COURT:  Mr. Waterman?

4              MR. WATERMAN:  Yes.

5              THE COURT:  Am I correct when I remember that it

6    was Zions who asked me to let Zions continue to hold the money

7    rather than turn it over to the Court's registry, as is often

8    usually done?

9              MR. WATERMAN:  That is correct.  Zions filed that

10   motion.  Neither party, neither the receiver nor Mr. Jacobsen

11   took any effort to resolve the issue, and Zions Bank felt like

12   it had to move forward and obtain an order with respect to

13   those funds.  That was filed in March of 2019.  That motion

14   was not granted until the turnover order or what we refer to

15   as the turnover order in June of 2020.  And at that point

16   Mr. Jacobsen had withdrawn the monies.

17             THE COURT:  All right.

18             MR. WATERMAN:  Mr. Jacobsen withdrew the monies in

19   December of 2019.

20             I should add simultaneous with Mr. Jacobsen

21   withdrawing the funds he changed counsel and sought a

22   continuance before this court, and the receiver agreed to

23   those continuances.  Zions Bank had nothing to do, was not

24   consulted and had nothing to do with those continuances.

25             Even after Zions filed its motion in March of 2019

1        the receiver did not file his motion for turnover until July

2        of 2019.  Mid July, July 16.  And within two weeks, July 30,

3        Mr. Jacobsen responded and requested discovery.  Mr. Jacobsen

4        propounded written discovery to Zions Bank.  Zions Bank

5        responded.  Ultimately Mr. Jacobsen took the depositions of

6        five Zions Bank employees in October of 2019.  When that

7        discovery was completed Zions Bank did not have any further

8        involvement.  And it was the receiver who chose to go ahead

9        and provides continuances.  Of course then COVID hit also that

10       caused some continuances and problems of which we're all

11       aware.

12              THE COURT:  Mr. Waterman, what's kind of puzzling

13       me right now, maybe just because of so much time has lapsed, I

14       didn't think Mr. Jacobsen was a party to this lawsuit.

15              MR. WATERMAN:  Well, Your Honor said that at the

16       status conference a few months back.  I believe Mr. Jacobsen

17       is a party.  He accepted service, his counsel accepted

18       service.  That is Docket 150 where we have the acceptance of

19       service.  Mr. Jacobsen appeared before this Court at the

20       hearing and argued for one hour before this Court.  I believe

21       that he is a party.  He's not a named party on the Court's

22       docket, but certainly through the procedure that the receiver

23       established pursuant to court order parties could appear and

24       make claims for purposes of claim resolution that procedure

25       being specifically created for Mr. Jacobsen.

1          THE COURT:  Well, that's true.  Mr. Castleberry,

2     let me just, and I'll get back to you, do you view

3     Mr. Jacobsen as a party?

4          MR. CASTLEBERRY:  Your Honor, we do not view

5     Jacobsen as a party.  But to tell you the honest truth, this

6     isn't our fight.  We are not -- we have not taken a position

7     on that point.  We have not taken any steps with respect to

8     Jacobsen.  But we do not see him as a party.

9          THE COURT:  All right.  Go ahead, Mr. Waterman.

10         MR. WATERMAN:  Well, as long as we're on that

11    little tangent, Mr. Jacobsen specifically accepted service

12    through his counsel.  There's personal jurisdiction.  The

13    issue as to whether or not the 1.6 million is receivership

14    property would certainly be within the receivership statute

15    28 USC 754 stating that the receiver and the Court has

16    jurisdiction over property of the estate.  The Court's

17    turnover order of June 2020 established that the 1.6 million

18    was receivership property.  So I believe there's both subject

19    matter jurisdiction and personal jurisdiction as to

20    Mr. Jacobsen.

21         THE COURT:  Okay.  Go ahead.

22         MR. WATERMAN:  All right, thank you, Your Honor.

23         So this Court entered what we refer to as the

24    turnover at the end of June 2020.  It was at that point that

25    Zions Bank discovered that Mr. Jacobsen had withdrawn the

1    funds, and Zions Bank immediately informed the receiver and

2    requested that the receiver work with Zions Bank to recover

3    those monies from Zions Bank.  The receiver has not joined

4    Zions Bank and has taken no efforts to recover that

5    receivership property which everyone admits is in the hands of

6    Mr. Jacobsen.

7          And so the third element that Mr. Castleberry was

8    referring to was that the receiver must prove by clear and

9    convincing evidence willful disobedience with the order.  And

10   we contend that there is no willful disobedience.  The order

11   requires Zions Bank to transfer from Mr. Jacobsen's account to

12   the receiver the 1.6 million.  There is not $1.6 million in

13   Mr. Jacobsen's account.  And therefore we believe that there

14   is no willful disobedience with the order.

15         In the receiver's reply, they mention that, and

16   Mr. Castleberry this morning has indicated, the initial asset

17   freeze order.  First, that is not the basis of the motion.

18   Second, Zions Bank when it was served with the asset freeze

19   order because it was not clear on the face of the order asked

20   the serving agents, are we freezing outgoing monies only or

21   are we also preventing incoming monies?

22         The serving agent instructed Zions Bank to freeze

23   both, and it is because of that that the money in the

24   overnight accounting function was not posted to the Rust Rare

25   Coin account.  And let's keep in mind, one person at Zions

1    Bank was served with that order.  Zions Bank has 15,000

2    employees in 11 states.  It must rely upon computer systems,

3    and all accounting is done on an overnight basis.  It's only

4    because of the freak occurrence that we had a wire transfer

5    for which under banking regulations the bank must give

6    immediate credit to the customer, that being Rust Rare Coin in

7    this case, and the asset freeze order then intervening prior

8    to the overnight posting and accounting that this problem

9    occurred.  So it's somewhat of a unique circumstances.

10          But when it came time to argue whether the

11   1.6 million was property of the receivership estate Zions Bank

12   took no part in that.  Your Honor has the transcript of that

13   hearing.  Actually I should say took no part.  Zions Bank,

14   myself as counsel for the bank was present at the hearing, and

15   at that hearing did state that we had filed the

16   intervention -- or excuse me -- the interpleader motion and

17   that we were holding the funds.  At that point in time I was

18   unaware and those at Zions Bank working on the Rust Rare Coin

19   matter was unaware that Mr. Jacobsen had withdrawn the funds.

20          And as of that hearing, until entry of the turnover

21   order, Zions Bank had no legal duty to hold those funds.  And,

22   you know, I thought actually when we convened on March 30th

23   that the purpose of that hearing was going to be those aspects

24   of Zions motion Docket 380 that dealt with the request to

25   provide relief from the turnover order with respect to having

1    Mr. Jacobsen be the one in possession of the receivership

2    property to surrender it.

3         In any event, Mr. Castleberry has cited some cases.

4    The one cited in the reply that I find very curious is the

5    Supreme Court decision in <u>Maggio vs. Zeitz</u>.  And that decision

6    arose out of a bankruptcy proceeding under the old bankruptcy

7    act.  This is a 1948 Supreme Court decision.  And the language

8    that they cite from that opinion is at Page 69.  And they cite

9    it as if it is the holding of the case saying, the court may

10   not go back and change its turnover order.

11        But the court proceeds to say, that does not mean

12   that they must affirm orders which first direct a bankrupt to

13   do an impossibility and then punish him for the refusal to

14   perform it.  In fact, the Court goes on to say:  The contempt

15   proceeding must begin with acceptance of the turnover order

16   but does not mean that it must end with it.

17        And then the Court was very concerned in that case

18   because the Second Circuit had found that:  Although we know

19   that Maggio, who was the debtor or bankrupt, cannot comply, we

20   must keep a straight face and pretend he can.  That is in

21   connection with the contempt proceeding.

22        So the Court then actually holds in that case when

23   the trustee institutes a later proceeding to commit, that is

24   the receiver instituting a contempt proceeding, the movant,

25   that is the trustee, the movant, he the receiver must tender

1 the issue as to present willful disobedience against which the

2 Court has asked to direct its sanctions.

3   The receiver has not shown any willful

4 disobedience.  The receiver admits that Mr. Jacobsen has the

5 funds and that Zions Bank cannot transfer money from

6 Mr. Jacobsen's account to the receiver.  The language of the

7 second service, we can't pretend that Zions Bank can comply

8 with a transfer of funds that are not in the account.

9   Now, Mr. Castleberry says money is money.  It's all

10 fungible.  We all know that's not how banks work.  The banks

11 don't have a giant pot of money sitting in the middle of the

12 room from which the first person can withdraw the funds.  It

13 must account for the funds.  And in this case, Zions Bank does

14 not have money in the Jacobsen trust account.  Because of that

15 the willful disobedience has not been established because

16 Zions Bank is incapable of transferring the funds.

17   That is an essential element.  And in fact,

18 Mr. Klein during the status conference said he does have the

19 ability to file suit against Mr. Jacobsen to recover the

20 funds, however, he's not chosen to do so.  As Mr. Castleberry

21 says, no.  Instead we would rather seek to impose an indemnity

22 obligation on Zions Bank.  And frankly, there was no legal

23 duty of Zions Bank to hold those funds.

24   The purpose of contempt is to coerce compliance

25 with the order.  It's not to establish an indemnity.  And for

17

1    that reason we would ask the Court to deny the motion for

2    contempt.

3               THE COURT:  Thank you.

4               Mr. Castleberry, you respond.  Is it willful

5    disobeying or willful or negligent, or what do you think is

6    the correct standard here?

7               MR. CASTLEBERRY:  Your Honor, just as far as the

8    correct standard, there does not have to be willful

9    disobedience.  But to cite the cases from Zions Bank, the

10   party who seeks to not be held in contempt must show that it

11   was reasonably diligent and energetic in attempting to

12   accomplish what was ordered.  And this is settled case law in

13   the 10th Circuit, and that is the standard that Your Honor

14   must use when determining the outcome of this case.

15              THE COURT:  I must find they were not reasonably

16   diligent?

17              MR. CASTLEBERRY:  Correct, Your Honor.  That they

18   did not take reasonable steps.

19              THE COURT:  Okay.  Go ahead, please.  What do you

20   say to Mr. Waterman's argument?  Sorry, no can do.  The money

21   isn't in the account.

22              MR. CASTLEBERRY:  Well, again, Your Honor, that

23   begs the question, why is the money not in the account?  And

24   did Zions Bank take reasonable steps to save the money?  And

25   there's been a couple references to the fact that Zions Bank

1    had no reason to hold this money, was under no duty to hold

2    this money.  That raises an eyebrow because Zions Bank

3    recognized there were competing claims on this money, and it

4    sought to intervene and interplead the money.  Why would it do

5    that?  Because it knew that it would space the claims if it

6    were to give the money to one party or another.  That's why it

7    rightly sought to intervene, and that's why it sought to

8    interplead the money.

9              And again, just looking at the facts, the turnover

10   order is clear.  There's been a passing reference that it

11   should be amended or withdrawn.  But there's no proper motion

12   before the Court to reconsider this prior order.  And it would

13   be inappropriate to do so at this stage, as well.

14             Zions Bank raises the defense, we cannot comply.

15   That is an inequitable defense to win the day.  It has to show

16   it has clean hands.  It simply cannot do so.  And if this were

17   to be a viable defense, it would open up floodgates to parties

18   saying, well, I can't comply because the money's not there.

19   Yes, I did make some mistakes.  Yes, I did make

20   representations where the money is.  Those were incorrect.

21   And because of that I cannot comply.  That just isn't an

22   unworkable standard.

23             THE COURT:  What about Mr. Waterman's argument that

24   what you're doing is seeking to make Zions the indemnitor?

25             MR. CASTLEBERRY:  Your Honor, Zions Bank assumed

1    the risk.  It undertook that role.  And it's similar to a

2    bailee type of situation.  If someone takes another's

3    property, the person holding that property must safeguard it,

4    must take reasonable steps to safeguard it.  This would be no

5    different than if Zions Bank had a piece of property in the

6    safe deposit box, but it allowed someone else to take that

7    money.

8              In the role that it is in it is under a duty and

9    obligation as a bailee or by assuming the risk to safeguard

10   that money and take reasonable steps to safeguard that money.

11             THE COURT:  All right.  Anything else you wish to

12   tell me?

13             MR. CASTLEBERRY:  Thank you very much for your

14   time, Your Honor.  We're grateful for your thoughtful

15   consideration of the issues.  For these reasons we ask the

16   Court to grant the motion and also award receiver's reasonable

17   costs and fees in bringing the motion.

18             THE COURT:  All right.

19             MR. WATERMAN:  Your Honor, if I might address that

20   issue that Mr. Castleberry just stated.

21             THE COURT:  And which issue is that, sir?

22             MR. WATERMAN:  The duty of Zions Bank to hold the

23   funds as if it was a bailee.

24             THE COURT:  All right.

25             MR. WATERMAN:  That is a negligence claim.  That is

1     not contempt.  And if a receiver wants to sue Zions Bank for

2     being negligent in the handling of the monies, that is

3     different than seeking contempt.

4             THE COURT:  All right.  I understand that.  All

5     right.  We'll be in recess now.  Yes.  I'm taking it under --

6          (Whereupon, the court proceedings were concluded.)

7                         *   *   *   *   *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF UTAH          )

 2                           )  ss.

 3    COUNTY OF SALT LAKE   )

 4              I, KELLY BROWN HICKEN, do hereby certify that I am

 5    a certified court reporter for the State of Utah;

 6              That as such reporter, I attended the hearing of

 7    the foregoing matter on April 12, 2021, and thereat reported

 8    in Stenotype all of the testimony and proceedings had, and

 9    caused said notes to be transcribed into typewriting; and the

10    foregoing pages number from 3 through 21 constitute a full,

11    true and correct report of the same.

12              That I am not of kin to any of the parties and have

13    no interest in the outcome of the matter;

14              And hereby set my hand and seal, this _____ day of

15    _____ 2021.

16

17

18

19

20                         _____
                                  KELLY BROWN HICKEN, CSR, RPR, RMR
21

22

23

24

25
```