Joseph M.R. Covey (7492) (jcovey@parrbrown.com)
Cynthia D. Love (14703) (clove@parrbrown.com)
**PARR BROWN GEE &LOVELESS, P.C.**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Facsimile: (801) 532 7750

*Attorneys for Johnathan O. Hafen as Receiver for the Rust Rare Coin Receivership*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, and<br><br>STATE OF UTAH DIVISION OF SECURITIES, through Attorney General Sean D. Reyes<br><br>    Plaintiffs,<br>        v.<br><br>RUST RARE COIN INC., a Utah corporation, and GAYLEN DEAN RUST, an individual, DENISE GUNDERSON RUST, an individual, and JOSHUA DANIEL RUST, an individual,<br><br>    Defendants;<br><br>and<br><br>ALEESHA RUST FRANKLIN, an individual, R LEGACY RACING INC, a Utah corporation, R LEGACY ENTERTAINMENT LLC, a Utah limited liability company, and R LEGACY INVESTMENTS LLC, a Utah limited liability company.<br><br>    Relief Defendants. | **MOTION FOR PONZI DETERMINATION AND TO ESTABLISH AN OBJECTION PROCEDURE**<br><br><br>Civil No. 2:18-cv-00892-TC-DBP<br><br>Judge Tena Campbell<br>Magistrate Judge Dustin Pead |

Jonathan O. Hafen, as Court-Appointed Receiver (the "Receiver") for the assets of Rust Rare Coin, Inc. ("RRC"), Gaylen D. Rust, Denise G. Rust, and Joshua D. Rust (collectively with RRC, "Defendants"), as well as R Legacy Racing Inc., R Legacy Entertainment LLC, and R Legacy Investments LLC (collectively, "Relief Defendants" and, collectively with Defendants, "Receivership Defendants"), respectfully submits this Motion for Ponzi Determination and to Establish an Objection Procedure (this "Motion").

## RELIEF REQUESTED AND GROUNDS

Through this Motion, the Receiver requests a determination that Receivership Defendants operated a silver investment scheme (the "Silver Pool") as a Ponzi scheme since at least 2008 and that the Court establish an objection procedure pursuant to the Court's summary disposition procedure so that any interested party has the opportunity to be heard on the issue of whether the Silver Pool was a Ponzi scheme. Although the Court has previously determined that the Silver Pool operated as a Ponzi scheme in a number of the ancillary actions initiated by the Receiver,[1] those decisions are technically not binding on non-parties. *See Murdock v. Ute Indian Tribe of Uintah and Ouray Reservation*, 975 F.2d 683, 387 (10th Cir. 1992) (holding that collateral estoppel may be applied if "the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication"); *Kuhar v. Thompson Mfg. Inc.*, __ P.3d __, 2022 WL 481117 (Utah Ct. App. 2022) (same). In order to streamline other ancillary actions and conserve the resources of the Receivership Estate, the Receiver now seeks a conclusive determination that the Silver Pool operated as a Ponzi scheme since at least 2008. Such a

---

[1] *See Hafen v. Famulary*, 2:19-cv-00627-TC, Dkt. No. 28; *Hafen v. Brimley*, 2:19-cv-00875-TC, Dkt. No. 21; *Hafen v. Evans*, 2:19-cv-00895-TC, Dkt. No. 38.

2

determination will act to preclude further litigation of that issue.[2] The Receiver further asks the Court to establish a procedure through which interested parties, including parties to existing ancillary actions or with whom the Receiver has tolling agreements, can lodge objections or otherwise challenge the determination of a Ponzi scheme.

This Motion is supported by the Memorandum of Law set forth herein. Additionally, the Receiver submits the following in support of the Motion: (1) guilty pleas of Gaylen Rust, Denise, Rust, and Joshua Rust, true and correct copies of which are included as <u>Exhibit A</u>; (2) Jonathan O. Hafen's Receiver's Report ("Hafen Report") and its accompanying exhibits, a true and correct copy of which are included as <u>Exhibit B</u>; and (3) Expert Report of D. Ray Strong ("Strong Report") and its accompanying exhibits, a true and correct copy of which are included as <u>Exhibit C</u>.

## MEMORANDUM OF LAW

### INTRODUCTION

Since at least 2008, Receivership Defendants operated a classic Ponzi scheme in which they used funds from new investors to pay exorbitant returns to existing investors. Although Receivership Defendants' scheme occasionally took other forms, Receivership Defendants most commonly solicited funds from investors by claiming to invest those funds in the Silver Pool through which Receivership Defendants supposedly generated returns through the buying and selling of physical silver. Ultimately, Receivership Defendants defrauded investors of more than $200 million, causing significant harm to hundreds of families.

---

[2] As explained in more detail below, Gaylen Rust variably described his silver investment scheme as the Silver Pool, a commissions program, or similar iterations. Through the Motion, the Receiver seeks a determination that none of the various iterations of Rust's investment programs were legitimate and that all of the various programs touted by Rust were simply part of the larger Ponzi scheme.

3

Now that the individual Receivership Defendants have all pled guilty in their parallel criminal proceedings, the existence of a Ponzi scheme operated by Receivership Defendants is undisputable. Rather than wasting precious Estate resources by continuing to litigate the existence of a Ponzi scheme in each ancillary proceeding, the Receiver seeks a conclusive ruling from the Court that Receivership Defendants operated a Ponzi scheme since at least 2008 that will have preclusive effect in present and future ancillary actions.

## RELEVANT MATERIAL FACTS

### *Procedural and Factual History*

1. On November 13, 2018, the Commodity Futures Trading Commission ("CFTC") and the Utah Division of Securities ("UDOS") (collectively, the "Plaintiffs") initiated this action against Receivership Defendants and related parties, alleging that Receivership Defendants operated the Silver Pool as a Ponzi scheme. [Dkt. No. 1.]

2. On November 15, 2018, the Court appointed the Receiver as Temporary Receiver for the assts of Receivership Defendants. [Dkt. No. 22.]

3. On November 27, 2018, the Court entered an Order Appointing Receiver and Staying Litigation (the "Appointment Order"), which continued the Receiver's appointment until further order of the Court. [Dkt. No. 54.]

4. The Receiver was charged with, among other things, investigating the financial and business affairs of Receivership Defendants and recovering all assets of the Receivership Estate. [*Id.* ¶¶ 7, 41-42.]

5. On March 20, 2019, the Court entered an Order Staying Civil Case Pending Outcome of Criminal Proceedings, which stayed this action "until after entry of a guilty plea or a jury verdict of guilty in any criminal action brought by the U.S. Attorney." [Dkt. No. 149.]

6. On May 1, 2019, the Court entered an Order Granting Motion to Allow Summary Disposition Procedure, which established a set of procedures through which the Receiver could seek substantive relief from the Court and interested parties could lodge objections and obtain discovery without having to intervene in this matter. [Dkt. No. 165.]

7. On May 8, 2019, the U.S. District Attorney charged the individual Receivership Defendants with various crimes related to the operation of the Silver Pool as a Ponzi scheme. [*See United States v. Rust*, 2:19-cv-00164-TS-CMR, Dkt. No. 1, hereafter the "Criminal Proceedings".]

8. On June 13, 2019, the individual Receivership Defendants pled not guilty to the crimes with which they were charged. [Criminal Proceedings, Dkt. No. 19.]

9. On June 25, 2020, Denise Rust pled guilty to one count of money laundering related to the operation of the Silver Pool. [Criminal Proceedings, Dkt. Nos. 82, 87.]

10. On September 8, 2020, Denise Rust was sentenced to 18 months' imprisonment, followed by 36 months' supervised release. [Criminal Proceedings, Dkt. No. 93.]

11. On January 22, 2021, the Court granted the Receiver's Motion for Partial Summary Judgment in the *Hafen v. Famulary* ancillary action, finding "that Receivership Defendants operated the Silver Pool as a Ponzi scheme since at least 2008." [*Famulary*, 2:19-cv-00627-TC, Dkt. No. 28 at 10.]

12. On April 15, 2021, the Court granted the Receiver's Motion for Summary Judgment in the *Hafen v. Brimley* ancillary action, finding that the "Silver Pool operated by Receivership Defendants was a Ponzi scheme since at least 2008." [*Brimley*, 2:19-cv-00875-TC, Dkt. No. 21 at 13.]

13. On August 9, 2021, the Court granted in part the Receiver's Motion for Partial Summary Judgment in the *Hafen v. Evans* ancillary action, finding that "the Receivership Defendants operated the Silver Pool which constituted a Ponzi scheme since at least 2008." [*Evans*, 2:19-cv-00895-TC, Dkt. No. 38 at 10.]

14. On December 20, 2021, Gaylen Rust pled guilty to wire fraud conspiracy, money laundering conspiracy, and securities fraud in connection with operation of the Silver Pool. [Criminal Proceedings, Dkt. Nos. 132, 134.]

15. On March 8, 2022, Gaylen Rust was sentenced to 19 years' imprisonment, followed by 36 months' supervised release. [Criminal Proceedings, Dkt. No. 156.]

16. On March 8, 2022, Joshua Rust pled guilty to misprision of wire fraud conspiracy in connection with the Silver Pool.[3] [Criminal Proceedings, Dkt. Nos. 159, 162.]

### *Receivership Defendants' Fraudulent Scheme*

17. Since at least 2008, Receivership Defendants operated an investment scheme promoted as a "silver trading program." [Ex. A, Statement by Defendant in Advance of Plea of Guilty and Plea Agreement ("G.Rust Guilty Plea"), at 5.]

18. In operating the scheme, Receivership Defendants "knowingly and willfully" conspired "to defraud investors by inducing them to invest in RRC's 'silver trading program' through material misrepresentations and omissions of material fact about the program." [*Id.*]

19. G.Rust promoted the Silver Pool as "a lucrative investment that involved the buying and selling of actual physical silver bullion." [*Id.*]

20. G.Rust falsely represented to investors "[t]hat 100% of investor funds would be used to buy actual, physical silver; when in fact [G.Rust] diverted nearly all investor funds

---

[3] Joshua Rust is set to be sentenced on May 31, 2022. [Criminal Proceedings, Dkt. No. 159.]

received to unrelated businesses, to personal uses, and to make payments to other investors."
[*Id.*]

21. G.Rust falsely represented to investors "[t]hat only half the amount of silver bought for the investor would be 'traded' with the other half stored for safekeeping to minimize investment risk; when in fact, there was no significant actual silver trading occurring and no meaningful amount of investor money was used to purchase and store actual silver." [*Id.* at 6.]

22. G.Rust falsely represented to investors "[t]hat the profit generated in trades would be used to repurchase a larger amount of silver at a lower price, thereby continually increasing the amount of silver for investors; when in fact, there was no actual silver trading occurring." [*Id.*]

23. G.Rust falsely claimed "[t]hat by using algorithms, the silver trading program never experienced a losing month, much less a losing year, that the worst year had generated a 12% return, and that the average rate of return was 20 to 25% per year; when in fact, RRC traded almost no silver and had no trading mechanism that could generate such returns, and [Receivership Defendants] used investor money in a way that only ever resulted in losses of the invested funds." [*Id.*]

24. G.Rust expressly admitted that he "used investor funds for [his] own personal use and benefit, for unrelated businesses that all operated at significant losses, and to pay other investors." [*Id.*]

25. G.Rust further admitted that "[t]o convince investors and potential investors that their investments were profitable and to convince potential investors that the silver trading program was earning money, [he] used investment money from later investors to pay the promised returns to earlier investors" and that this "created the false impression that the silver

trading program was profitable, that the investments were safe and secure, and that the promised returns were being generated through trading." [*Id.* at 6-7.]

26. In addition to G.Rust's express admissions in his Guilty Plea, the Receiver's own investigation confirms that Receivership Defendants operated the Silver Pool as a Ponzi scheme since at least 2008 and that G.Rust's admissions are corroborated by substantial additional evidence.

27. Receivership Defendants solicited funds from investors by representing that they would use such funds to trade physical silver, thereby generating returns for investors. [Hafen Report, at pp. 12-13, and Exhibit A thereto, ¶ 98.]

28. Specifically, the Receivership Defendants represented that one-half of invested funds would be used to purchase physical silver, which would be stored at Brink's facilities. According to the Receivership Defendants' representations, the remaining one-half of the invested funds would be used to buy and sell physical silver on the commodities market, thereby increasing the investor's silver holdings over time and generating returns on the investment. [Hafen Report, at p. 12, and Exhibit A thereto, ¶¶ 20, 98.]

29. In reality, investor funds were not used to purchase physical silver. [Hafen Report, at pp. 13-14, and Exhibit A thereto, ¶ 22.]

30. G.Rust expressly admitted that new investor funds were used to pay returns to existing investors and to fund other businesses that were unrelated to the Silver Pool. [Strong Report, at pp. 13-15.]

31. Although the Receivership Defendants represented that they managed over $80 million of physical silver and that approximately one-half of that amount was stored at Brink's locations in Salt Lake City and Los Angeles, there is no evidence that the Receivership

Defendants ever stored significant amounts of physical silver at Brink's or any other facility. [*Id.*, at pp. 9-10, 48.]

32. G.Rust expressly admitted that there was no significant amount of silver stored at Brinks at the time of the Receiver's appointment. [Hafen Report, at p. 13, and Exhibit A thereto, ¶ 99.]

33. There is no evidence that the Receivership Defendants ever traded significant amounts of physical silver on a regular basis in the manner represented to investors. [Hafen Report, at p. 13, and Exhibit A thereto, ¶ 99.]

34. Since 2008, the Receivership Defendants raised at least $225 million from investors and paid out at least $175 million to investors. [Strong Report, at pp. 6-7.]

35. Even as early as tax year 2008 ("TY2008"), the net operating income obtained through the Receivership Defendants' limited business operations was insufficient to make payments to investors:

   a. The total net operating income of RRC—Rust's only profit-generating business—in TY2008 was at best $259,154.

   b. During TY2008, the Receivership Defendants took in at least $3.2 million in payments from investors.

   c. During TY2008, the Receivership Defendants made payments to investors in excess of $1.6 million.

   d. During TY2008, the Receivership Defendants also made payments to other RRC-affiliated businesses in excess of $1.5 million.

   e. From at least TY2008, the income generated from operations of the Receivership Defendants was grossly insufficient to finance the substantial payments promised

to investors. New funds contributed by unsuspecting investors provided the only funding source large enough to facilitate these payments.

[Strong Report, at pp. 6, 23-24.]

36. The payments made to investors since 2008 could only have been sourced from funds raised from other investors; there was no other source of funds from which these payments could have been made. [*Id.*, at p. 76.]

37. From 2008 through the appointment of the Receiver in 2018, the Receivership Defendants continued to take in ever-increasing funds from investors and to pay out exorbitant returns. Between January 1, 2018, and November 15, 2018, the Receivership Defendants paid more than $37 million to investors. [*Id.*, Exhibit 25, p. EX194 (summarizing amounts raised from and paid to investors on a year-by-year basis).]

38. The Receivership Defendants represented that the Silver Pool was "risk free," "no risk," or "virtually risk free" because the investment was backed by physical silver, which would always have value. [Hafen Report, at p. 6, and Exhibit A thereto, ¶ 125.]

39. The Receivership Defendants guaranteed "no loss of principle [sic]" invested. [Strong Report, Exhibit 8, p. EX104.]

40. The Receivership Defendants represented that the Silver Pool paid an average return of 20-25%. [*Id.*, at p. 44.]

41. The Receivership Defendants represented that returns between 2012 and 2017 exceeded 40%. [*Id.*, Exhibit 35, pp. EX235-36.]

42. The Receivership Defendants represented that the lowest return on the Silver Pool investment during a thirty-year period was 12%. [Strong Report, at p. 44.]

43. Investor statements provided by the Receivership Defendants reflected that <u>every</u> silver trade was profitable and that the Receivership Defendants had <u>never</u> lost money on a trade. [*Id.*, at p. 7.]

44. The Receivership Defendants promoted the Silver Pool as an exclusive program offered only to those investors G.Rust knew personally. [*Id.*, at pp. 58-59.]

45. The Receivership Defendants falsely claimed to have a trading relationship with HSBC, one of the world's largest banks, and to employ a proprietary trading algorithm that allowed the Receivership Defendants to beat the market. [Hafen Report, at p. 21, and Exhibit A thereto, ¶¶ 122, 129-30.]

46. The Receivership Defendants paid exorbitant returns to investors for years, creating the false impression that profits were being earned and thereby attracting new investors to the scheme and convincing existing investors to increase their investment. [Strong Report, at p. 7.]

47. Investors have likely suffered in excess of $100 million in net principal losses. [*Id.*, at p. 77.]

## ARGUMENT

### I.   Factors Governing Ponzi Determination

A Ponzi scheme is "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments." *Jobin v. McKay*, 84 F.3d 1330, 1332 n.1 (10th Cir. 1996); *accord S.E.C. v. Management Solutions, Inc.*, No. 2:11-cv-1165-BSJ, 2013 WL 4501088, at *19 (D. Utah Aug. 22, 2013). "In order to show that an investment scheme falls within the definition of a Ponzi scheme, the Receiver must prove by a preponderance of the evidence the *sine qua non* of a Ponzi scheme: that returns to earlier investors were paid by funds from later investors."

*Management Solutions*, 2013 WL 4501088, at *19. In addition, Ponzi schemes typically—though not always—exhibit the following characteristics:

- Investors are promised substantial returns;
- Investors are promised returns with little or no risk;
- Investors are promised consistent returns;
- Investors are paid the promised returns for at least some time, which attracts new investors to the program;
- The scheme is generally insolvent from the beginning;
- The scheme is secret, exclusive, and/or highly complex.

*Id.* As explained in detail herein, it is undisputable that the Silver Pool operated as a Ponzi scheme since at least 2008.

## II. Receivership Defendants' Guilty Pleas Conclusively Establish the Existence of a Ponzi Scheme.

Receivership Defendants' guilty pleas and factual admissions conclusively establish that the investment scheme operated by Receivership Defendants was a Ponzi scheme. Numerous courts have concluded that a guilty plea or a criminal conviction of the operator of a Ponzi scheme conclusively establishes that a Ponzi scheme occurred. *See, e.g.*, *In re Slatkin*, 525 F.3d 805, 814 (9th Cir. 2008) ("We now hold that a debtor's admission, through guilty pleas and a plea agreement admissible under the Federal Rules of Evidence, that he operated a Ponzi scheme with the actual intent to defraud his creditors conclusively establishes the debtor's fraudulent intent . . . and precludes relitigation of that issue."); *In re AFI Holding, Inc.*, 525 F.3d 700, 704 (9th Cir. 2008) (holding that the Ponzi operator's guilty plea "demonstrates the existence of fraudulent intent and a Ponzi scheme"); *In re Fin. Federated Title & Trust, Inc.*, 347 F.3d 880,

886 n.5 (11th Cir. 2003) ("[T]he guilty pleas of ABS and Ray Levy undisputably establish that this Debtor's operations were nothing more than a massive fraud and Ponzi scheme."); *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995) (accepting Ponzi scheme operator's guilty plea as evidence establishing existence of a Ponzi scheme); *Wiand v. Morgan*, 919 F. Supp. 2d 1342, 1361 (M.D. Fla. 2013) (collecting cases); *In re Barnard L. Madoff Inv. Securities LLC*, 445 B.R. 206, 220-21 (S.D.N.Y. 2011) (collecting cases and finding existence of a Ponzi scheme "particularly in light of Madoff's criminal admission"); *In re Rothstein Rosenfeldt Adler, P.A.*, 2010 WL 5173796, at *5 (S.D. Fla. Dec. 14, 2010) ("Criminal plea agreements are admissible to establish the existence of a Ponzi scheme and a wrongdoer's fraudulent intent."); *Wing v. Alvey*, No. 2:08-cv-796, 2009 WL 223612, at *1 (D. Utah Jan. 29, 2009) ("[N]umerous courts have also held that a criminal conviction for operating a Ponzi scheme establishes the operator's fraudulent intent."); *In re McCarn's Allstate Finance, Inc.*, 326 B.R. 843, 851 (M.D. Fla. 2005) ("Even if the information or indictment did not specifically label the fraud a 'Ponzi scheme,' if the allegations in the information establish that the debtor ran a scheme whereby the debtor intended to defraud the debtor's creditors, evidence of a guilty verdict or plea agreement admitting the charges can establish the existence of a Ponzi scheme.").

G.Rust's Guilty Plea does not merely admit to the operation of a Ponzi scheme. G.Rust admits to specific facts conclusively establishing that Receivership Defendants' investment program operated as a Ponzi scheme, including but not limited to the following:

1. That Receivership Defendants "diverted nearly all investor funds received to unrelated businesses, to personal uses, <u>and to make payments to other investors</u>";

2. That, despite G.Rust's representations to investors, "there was no significant actual silver trading occurring and no meaningful amount of investor money was used to purchase and store actual silver";

3. That "RRC traded almost no silver and had no trading mechanism that could generate such returns, and we used investor money in a way that only ever resulted in losses of the invested funds";

4. That G.Rust "used investor funds for [his] own personal use and benefit, for unrelated businesses that all operated at significant losses, and to pay other investors";

5. That "[t]o convince investors and potential investors that their investments were profitable and to convince potential investors that the silver trading program was earning money, [G.Rust] used investment money from later investors to pay the promised returns to earlier investors."

[Ex. A, G.Rust Gulity Plea at 5-7.]

Thus, the G.Rust Guilty Plea conclusively establishes the *sine qua non* of a Ponzi scheme: that newly invested funds were used to pay returns to existing investors. *See S.E.C. v. Management Solutions, Inc.*, No. 2:11-cv-1165-BSJ, 2013 WL 4501088, at *19 (D. Utah Aug. 22, 2013). The Receiver's independent investigation is entirely consistent with the G.Rust Guilty Plea and confirms that Receivership Defendants operated their investment program as a Ponzi Scheme.

### III. Receivership Defendants' Investment Program Was a Ponzi Scheme.

Pursuant to the Court's instructions, the Receiver has extensively investigated the business dealings of Receivership Defendants. The Receiver's investigation also conclusively establishes that Receivership Defendants operated their investment program as a Ponzi scheme.

As an initial matter, as in the G.Rust Guilty Plea, G.Rust expressly admitted when interviewed by investigators that he used newly invested funds to pay returns to existing investors. *See* Hafen Report at 15 & Ex. F at 11:8-18. Similarly, G.Rust admitted that—despite his representations to investors—Receivership Defendants engaged in little to no trading and that what little trading was conducted had generated net losses to investors. *See* Hafen Report, Ex. F at 30:12-31:2.

These admissions are consistent with the Receiver's review of the books and records of Receivership Defendants. The Receiver discovered no evidence of purchases of silver in the amounts necessary to correlate with G.Rust's representations to investors. Hafen Report at 16. Nor has the Receiver discovered any evidence that Receivership Defendants ever stored significant amounts of physical metals at Brinks or any other facility. *Id.*

Mr. Stong's analysis confirms that Receivership Defendants used newly invested funds to pay returns to existing investors. Since 2008, the Receivership Defendants raised at least $225 million from and paid out at least $175 million to investors. Strong Report, at pp. 6-7. Mr. Strong also opined that the net operating income of RRC—the only profit-making business—was insufficient to make payments to investors. *Id.* at 76.

For example, Mr. Strong's analysis revealed that RRC's total operating income in TY2008 was, at best, $259,154. *Id.* at 6, 23-24. During that same year, RRC took in at least $3.2 million from investors and made payments in excess of $1.6 million to investors. *Id.* RRC also made payments to its affiliated business entities in excess of $1.5 million. *Id.* None of the other RRC-affiliated entities was a net cash-positive operation and all were heavily subsidized by RRC. *Id.* Based on the finances of RRC and its affiliated entities, it is clear that the payments made to investors in 2008 could only have come from other investors' funds. *Id.* There was simply no other source of funds from which to pay these investor returns.

Moreover, from 2008 until the appointment of the Receiver in November 2018, Receivership Defendants' financial condition continued to deteriorate. As Mr. Strong's analysis makes clear, Receivership Defendants continued to take in ever-increasing funds from investors and to pay out exorbitant returns without any legitimate underlying business activity. Strong Report, EX194 (summarizing amounts raised from and paid to investors on a year-by-year basis).

The Receiver's preliminary analysis has revealed that investors likely suffered net principal losses in excess of $100 million related to the Receivership Defendants' actions.[4] [*Id.* at 77.] At the time the Enforcement Action commenced, the assets of RRC were grossly inadequate to repay the amounts owed to investors, and RRC had no reasonable expectation of ever generating sufficient funds to repay those amounts.

In short, the Silver Pool exhibited the classic characteristics of a Ponzi scheme:

(1) newly attracted investor funds were used to finance payments to existing investors;

(2) investors were promised significant returns with little to no risk;

(3) investors were promised that these returns would be consistent;

(4) the Receivership Defendants, in fact, paid substantial returns to early investors in order to entice new investment;

(5) the Receivership Defendants promoted the Silver Pool as an exclusive, highly complex investment opportunity;

---

[4] In the G.Rust Guilty Plea, G.Rust stipulated to a money judgment in the amount of $153,073,328.32 and indicated that such a judgment represented "property acquired from or traceable to my offenses." G.Rust Guilty Plea at 10.

(6) the Receivership Defendants' assets were grossly inadequate to repay amounts owed to investors, and the Receivership Defendants had no reasonable expectation of being able to generate sufficient funds to meet those obligations.

## **OBJECTION PROCEDURE**

As discussed above, the Court has previously determined in three separate ancillary proceedings that the investment scheme operated by Receivership Defendants was a Ponzi scheme. *See Hafen v. Famulary*, 2:19-cv-00627-TC, Dkt. No. 28; *Hafen v. Brimley*, 2:19-cv-00875-TC, Dkt. No. 21; *Hafen v. Evans*, 2:19-cv-00895-TC, Dkt. No. 38. The Receiver desires to obtain a definitive finding in this action that Receivership Defendants operated a Ponzi scheme, which will eliminate the need to continue re-litigating the issue in all of the outstanding ancillary proceedings or any future ancillary proceeding. In order to streamline other ancillary actions and conserve the resources of the Receivership Estate, the Receiver now seeks a conclusive determination that the Silver Pool operated as a Ponzi scheme since at least 2008, which will act to preclude further litigation of that issue.

Because the Receiver recognizes that certain interested parties may wish to object or respond to this Motion, the Receiver respectfully requests that the Court apply the Summary Disposition Procedure previously established by the Court to this Motion and all objections related thereto. [*See* Dkt. No. 165.] This will allow the Receiver to expeditiously and cost effectively resolve any challenges to the Ponzi scheme determination while preserving the due process rights of litigants in the ancillary proceedings and other interested parties. To that end, the Receiver proposes the following procedures:

1. Once the Receiver files this Motion, the Receiver will serve a copy of the Motion and accompanying exhibits on all parties to existing ancillary proceedings and any party

17

with whom the Receiver has a tolling agreement. The Receiver will also serve a copy of the Motion and accompanying exhibits to all parties on the Receiver's master mailing matrix and post a copy to the Receiver's website at http://rustrarecoinreceiver.com.

2. As set forth in the Court's *Order Granting Motion to Allow Summary Disposition Procedure*, any party wishing to object or respond to this Motion must lodge their response or objection directly with the Receiver within <u>30 days</u>. The objecting party will not become a party to the overall proceeding, will not intervene in the case, and <u>will not file any pleadings or other documents directly with the Court</u> unless otherwise authorized to do so by the Court.

3. The Receiver shall provide copies of all objections received to Plaintiffs.

4. If the objecting party specifically requests discovery, the parties will have an additional 30 days to complete discovery. Discovery will be conducted pursuant to the *Federal Rules of Civil Procedure*, except that written discovery must be responded to within 14 days. Either side may seek relief from the Court if the requested discovery is unduly burdensome or not proportional to the issues being determined.

5. Following the close of any specifically requested discovery, the Receiver will lodge the objections with the Court and request a hearing on the matter. If an evidentiary hearing is needed, the Receiver will schedule additional deadlines regarding disclosure of witnesses and exhibits as needed.

6. The Receiver and Plaintiffs may file a response to any objection five days before the hearing.

## CONCLUSION

For the reasons discussed herein, the Receiver respectfully requests a conclusive determination that Receivership Defendants operated a Ponzi scheme since at least 2008. The Receiver requests that the Court adopt its previously approved summary disposition procedure as the objection procedure for any person objecting to this Motion. Such a streamlined process will obviate the need for the Receiver to continue to re-litigate the Ponzi issue, which will greatly reduce the financial impact on the Receivership Estate, while allowing interested parties a meaningful right to be heard.

A proposed order is submitted herewith.

DATED this 15th day of March, 2022.

                                              PARR BROWN GEE & LOVELESS, P.C.

                                              /s/ *Cynthia D. Love*
                                              Joseph M.R. Covey
                                              Cynthia D. Love

                                              *Attorneys for the Receiver*

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the above **MOTION FOR PONZI DETERMINATION AND TO ESTABLISH AN OBJECTION PROCEDURE** was (1) electronically filed with the Clerk of the Court through the CM/ECF system on March 15, 2022, which sent notice of the electronic filing to all counsel of record, (2) posted on the Receiver's website (rustrarecoinreceiver.com), (3) emailed to all those on the Receiver's master mailing matrix, and (4) served on all parties to existing ancillary proceedings and any party with whom the Receiver has a tolling agreement.

/s/ *Cynthia D. Lovei*